**David MORRIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–86–545–CR.**

Court of Appeals of Texas,
Corpus Christi.

Dec. 31, 1987.

Rehearing Denied Feb. 11, 1988.

Kenneth Botary, Corpus Christi, for appellant.

Grant Jones, Corpus Christi, for appellee.

Before BENAVIDES, UTTER and KENNEDY, JJ.

OPINION

BENAVIDES, Justice.

Appellant, David Morris, was convicted of murder and sentenced to serve sixty years in the Texas Department of Corrections. This appeal involves a challenge to appellant's conviction based on a jury verdict which rejected his affirmative defense of insanity. We affirm the conviction.

In his original brief, appellant asserts three points of error: (1) there was insufficient evidence to support a conviction for murder; (2) the evidence was insufficient to show the cause of death was by shooting the victim with a firearm; and (3) the trial court erred in permitting the State to introduce improper punishment evidence. In his supplemental brief, appellant asserts two additional points of error: (1) the trial court committed fundamental error when the court's charge placed the burden of proof regarding the issue of insanity on the appellant; and (2) the State's evidence was insufficient to prove that appellant was sane at the time of the offense.

The following evidence is pertinent to the appellant's insanity defense. Appellant shot Genaro Ramirez with a .357 calibre pistol in downtown Corpus Christi. Appellant had patronized a local downtown bar for most of the evening. The manager of the bar, Eva Glover, testified at trial that the appellant had been a regular customer for three to four months prior to the shooting. According to Glover, appellant always "kept to himself," never caused any trouble, and was always nice and polite.

On the day of the shooting, appellant and Glover engaged in a normal conversation and he appeared to be coherent. Ramirez had arrived at the bar at approximately 1:00 a.m. and there had been no arguments or fights in the bar. Glover testified that appellant had left the bar approximately ten minutes before Ramirez. After Ramirez left the bar, Glover heard gunshots and looked out a window and saw appellant walking towards Ramirez shooting a gun. Ramirez fell onto the sidewalk and appellant walked away.

When the police arrived, they observed that the victim had two gunshot wounds, one in the jaw and the other in the back. The police found no weapon on or near the victim. Ramirez was taken to Memorial

Medical Center where he later died. The police searched a park located near the scene of the crime and found appellant hiding in some bushes. The officers placed appellant under arrest. In the pocket of the jacket lying beside him, the police officers found a .357 calibre pistol along with five expended rounds of bullets and one live round. The gun had been reloaded with six live rounds. Arresting police officer Chris McClure testified that appellant did not resist arrest, he responded to commands of police officers, and he displayed no signs that he was incapable of understanding what was going on.

Appellant gave the following written exculpatory statement to police officer Ray Rivera, Jr., after seven to eight hours in jail.

My name is David Morris and I am thirty-three years old. On June 6, 1985, I was at Elizabeth's Lounge most of the night off and on. I left the lounge early. There was a man in the lounge trying to start a fight. The man had a knife in his hand at one time. He kept moving around like he was going to stab someone but I'm not saying who. I left the lounge and was going to go but I saw someone down the street packing a gun. The gun was a big one. I didn't know who he was backing. He was further down the street. I had a nickel plated Smith and Wesson .357 magnum. The man left Elizabeth's Lounge and started walking towards the bus station. I walked to the corner away from Elizabeth's and then somebody started shooting at the man. This is true and correct to the best of my knowledge.

On June 7, 1985 at 9:20 a.m., approximately seven hours after the shooting, the appellant went before Magistrate Jack Hunter, who testified at trial that he could not remember the appellant specifically, but recognized the form he had prepared with regard to the appellant. Hunter testified that during the magistrate process, he followed a procedure whereby he would make notations on the form if a person was incoherent or could not understand his questions. Hunter noted that the appellant was alert and responded to questions asked. Hunter testified that the magistrate form indicated to him that the appellant was coherent and understood the questions asked.

On July 3, 1985, the appellant was placed in the jail's mental ward. Esiquio Rodriguez, a rehabilitation counselor for Nueces County Sheriff's Department, testified that the appellant was not on the same mental level as the other prisoners. Other inmates in the mental ward made complaints to Rodriguez that they were afraid of the appellant. At trial, Rodriguez testified that he had found some "wadded up" pieces of paper in the appellant's pockets shortly after his arrest. The papers found on the appellant contained unintelligible writings referring to a "King David" and a "supreme being." Rodriguez was of the opinion that Morris posed a threat to the safety of the other inmates, therefore, he removed the appellant from the general population to an isolation cell.

On November 14, 1985, the appellant received a competency hearing where a jury found him incompetent to stand trial. After seven months of treatment at the Rusk State Hospital, the appellant was returned to the court as competent to stand trial.

At trial, the defense presented several expert and lay witnesses in an attempt to establish the appellant's insanity defense. The defense elicited the testimony of several police officers. Officer Ray Rivera testified that he took the appellant's statement; that appellant understood the events transpiring; that the appellant did not appear to be acting crazy; and that the statement was not unusual and made sense to a police officer.

Detective Stimmler, a Corpus Christi police investigator, testified that he knew that the appellant ate regularly at a local restaurant. The manager of the restaurant told the detective that the appellant would on occasion talk to his food. When cross-examined, the detective acknowledged that it was possible that appellant could have been talking to himself and this was not necessarily abnormal behavior.

The defense also introduced the testimony of Police Officer David Martinez who had arrested the appellant two months before the shooting for disorderly conduct. According to Officer Martinez, the appellant was standing outside of a hotel at approximately 1:45 a.m., hollering that he was a captain and was building a ship. The officer had indicated on the appellant's booking sheet that the appellant's alias was "Captain King David." Officer Martinez, during cross-examination, testified that normally mentally ill persons will be admitted to Memorial Hospital rather than taken to jail. The officer testified he did not believe the appellant was mentally ill when arrested, and therefore, he did not take appellant to the hospital.

The defense elicited testimony from three expert witnesses, one psychologist and two psychiatrists, who had diagnosed the appellant as suffering from a schizophrenic condition. Dr. Sharon Rogers, a psychologist, had been appointed by the court to determine the appellant's competency to stand trial. Rogers spent three and a half hours with the appellant two and a half months after the shooting occurred. In order to diagnose the appellant, she conducted several diagnostic tests and obtained a psychological history from the parents of the appellant.

Appellant's parents informed Rogers that at the age of fourteen he had visions and thought he "had an angel." Rogers also related that in 1972 or 1973, the appellant was involved in an automobile accident and suffered a severe head injury. Morris was then admitted to Rainbow Mental Health Facility in Kansas City, Kansas for approximately three months. Several years later appellant was severely burned when a van, in which he had been sleeping, exploded. A doctor at Kansas Medical Center informed the parents that the appellant had suffered brain damage. The parents told Rogers that after the appellant was burned, he became hostile towards them. Rogers testified that at one point appellant either attempted to or actually did run over his parents in their own driveway. Sometime in 1977, appellant's parents were informed that their son had

moved to Missouri where he was later committed to a mental hospital. Rogers testified that in 1983, appellant's parents were informed that appellant had moved to California and was severely injured when he was hit by a "semi-truck" while on the side of the road working on his motorcycle. Sometime after the occurrence of this accident, appellant's parents received a phone call from an attorney who wanted to commence proceedings to have the appellant committed to a mental hospital. Rogers testified appellant was never committed because he had left California and "disappeared."

Rogers requested all of the appellant's mental and medical records from the health care facilities that had supposedly provided treatment for the appellant. The Kansas University Medical Center was the only facility that provided any information concerning the appellant. Rogers, therefore, testified that she could not verify the truthfulness or accuracy of the appellant's history as provided by his parents.

Rogers testified that it was her opinion that at the time she examined the appellant, he was suffering from a residual phase of a schizophrenic disorder. According to Rogers, the appellant was in remission at the time the evaluation was conducted.

Dr. Joel Kutnick, a psychiatrist, was appointed by the court not only to evaluate the appellant's competency to stand trial, but also to determine if he was insane at the time of the offense. Kutnick's first interview with the appellant was conducted in jail three months after the shooting. According to Kutnick, the appellant was suffering from loose associations and was completely incoherent. The doctor asked appellant several questions and received several bizarre answers in return. When asked about his reasons for coming to Corpus Christi, appellant started to talk about being "raised off the planet." Appellant told the doctor that his occupation consisted of doing computer work while sitting in a Sambo's restaurant. Kutnick stated that he was suspicious that the appellant "was trying to pull his leg," therefore, he re-

viewed the psychological testing conducted by Rogers and spoke with the jail counselor. The doctor then determined appellant was suffering from schizophrenia.

After seven months of hospitalization at the Rusk State Hospital, the hospital provided Kutnick with a summary that the appellant was competent to stand trial. On October 16, 1987, Kutnick re-evaluated the appellant and determined he was in remission and was rational and coherent. At trial, Kutnick testified that appellant was probably insane at the time of the shooting and was suffering from a delusional system so that he could not appreciate the wrongfulness of his conduct. The doctor, however, admitted that he could not be absolutely certain in this case. According to Kutnick, schizophrenics usually believe in only one delusion, and in this case the stories given by the appellant about the events that occurred varied. Likewise, the doctor admitted that psychiatry is a nebulous field and that it is difficult to evaluate what one's mental state was months before. Kutnick testified that an individual suffering from residual schizophrenia could also be capable of appreciating the wrongfulness of criminal conduct. On cross-examination, the doctor admitted that hiding in bushes after the commission of an offense suggests one is aware his conduct was wrong. The doctor stated that incarceration in a jail can cause a residual schizophrenic to rapidly deteriorate to an active phase. Kutnick was of the opinion that the appellant did in fact deteriorate while in jail and was "a lot better when first arrested."

While at Rusk Hospital, the appellant was under the supervision of Dr. Ninita Sabater, a staff psychiatrist at Rusk State Hospital. Sabater testified that the appellant is a chronic schizophrenic paranoid and that he was probably insane at the time of the offense. When cross-examined, the doctor admitted that she had not been provided with an offense or police report and had "no idea" whether or not the appellant was in remission at the time he committed the offense. Consistent with the testimony of the other experts, Sabater also admitted that it was likely a schizophrenic in remission could deteriorate after incarceration.

We initially address appellant's first supplemental point of error, wherein he asserts that the trial court committed fundamental error when its charge did not place the burden of proof regarding the defendant's sanity on the prosecution. The appellant argues that since a jury had previously found him incompetent to stand trial, the burden of proof shifted to the State to prove the appellant was sane at the time of the offense beyond a reasonable doubt.

■ In Texas, insanity is an affirmative defense to prosecution if at the time of the conduct charged, the accused, as a result of severe mental disease or defect, did not know his conduct was wrong. Tex. Penal Code Ann. § 8.01 (Vernon Supp.1987). There is no presumption of sanity in Texas. *Madrid v. State*, 595 S.W.2d 106, 112 (Tex. Crim.App.), *cert. denied*, 449 U.S. 848, 101 S.Ct. 134, 66 L.Ed.2d 58 (1980). The State is under no obligation to bring forward evidence that the appellant was sane at the time of the offense. *Madrid*, 595 S.W.2d at 112. The defendant has the burden to prove his insanity at the time of the offense by a preponderance of the evidence. Tex. Penal Code Ann. § 2.04(d) (Vernon 1974). An exception exists whenever insanity has been shown to exist by a prior unvacated adjudication of insanity. *Manning v. State*, 730 S.W.2d 744, 748 (Tex. Crim.App.1987); *Thompson v. State*, 612 S.W.2d 925 (Tex.Crim.App.1981).

■ When a defendant has been adjudicated insane, the presumption is that the insanity continues and the State has the burden to prove the accused's sanity at the time of the offense beyond all reasonable doubt. *Manning*, 730 S.W.2d at 748. The appellant contends that a prior finding of incompetency is sufficient to shift the burden to the State. The Texas Court of Criminal Appeals has clearly held that a finding of incompetency to stand trial does not constitute an adjudication of insanity. *Thompson*, 612 S.W.2d at 929. In *Manning*, the Court of Criminal Appeals concluded that a prior finding of incompetency shifts the burden to the State only for

incompetency, not insanity. *Manning*, 730 S.W.2d at 748.

In the case before us, there is no evidence in the record of any prior adjudication of insanity which would place the burden on the State. The mental medical history of the appellant, which was based on hearsay and was not confirmed, did not indicate that appellant had ever been adjudicated insane. Since we find that the burden of proof did not shift to the State, we overrule appellant's first supplemental point of error, and accordingly, overrule appellant's second supplemental point of error complaining that the State failed to meet its burden.

Having determined the appellant properly had the burden to prove insanity by a preponderance of the evidence, we next address appellant's first point of error which challenges the sufficiency of the evidence to support a conviction for murder. Appellant asserts that no rational trier of fact could have found he failed to establish his affirmative defense of insanity by a preponderance of the evidence. The appellant argues that the prosecution produced no substantial rebuttal evidence to counter his overwhelming evidence of insanity. Since the prosecution did not offer any medical or expert testimony, but merely cross-examined the defense experts, the appellant contends the jury had no rational basis to reject his affirmative defense.

■ When there is a challenge to the sufficiency of evidence to reject an affirmative defense, an appellate court must review the evidence of the affirmative defense by looking at the evidence in the light most favorable to the implicit finding of the jury and then determine, by examining all the evidence concerning the affirmative defense, if any rational trier of fact could have found that the defendant failed to prove his defense by a preponderance of the evidence. *Schuessler v. State*, 719 S.W.2d 320, 328 (Tex.Crim.App.1986); *Van Guilder v. State*, 709 S.W.2d 178, 181 (Tex. Crim.App.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986); *McBride v. State*, 706 S.W.2d 723, 725 (Tex.App.—Corpus Christi 1986, pet. ref'd).

■ Insanity is not strictly a medical issue; it involves ethical and legal issues as well. One may be medically insane by reason of a mental disease or defect, yet not legally exonerated for criminal acts unless the condition causes an inability to distinguish right from wrong. *Schuessler*, 719 S.W.2d at 329. Expert witnesses may aid the jury in its determination, but it is not necessary for the State to present expert medical testimony that the accused was sane in order to counter the testimony provided by defense experts. Implicit jury findings that the accused was not legally insane at the time of the offense can be upheld even though no medical expert testified to that effect. *Graham v. State*, 566 S.W.2d 941, 950 (Tex.Crim.App.1978). A jury may accept or reject in whole or in part the opinion testimony of physicians, and can accept lay testimony over the testimony of experts. *McBride*, 706 S.W.2d at 725.

■ The prosecution presented testimony of police officers and witnesses who observed the appellant shortly before and after the shooting. Glover, the manager of the bar, testified she had known the appellant for three to four months and considered him to be polite and nice. Prior to the shooting, Glover never had any trouble with the appellant and he appeared to be coherent. Several police officers testified that shortly after the shooting, the appellant understood what was transpiring and showed no signs of being incoherent or acting crazy. Seven to eight hours after the shooting, the appellant was alert and responded coherently to questions asked by a magistrate. Even defense witness Officer Martinez, who had arrested the appellant two months before the shooting, testified he did not believe the appellant was mentally ill. The three mental health experts who diagnosed the appellant as schizophrenic did not examine him until months after he was incarcerated. Additionally, all three experts acknowledged that it was very likely that the appellant could have rapidly deteriorated to an active phase while in jail. All of the experts agreed that it was possible that at the time of the

shooting, the appellant could have been in remission and able to appreciate that his conduct was wrong.

Kutnick discussed in detail the uncertainty involved in the psychiatry field in general, and about his uncertainty in this case. Both Kutnick and Rogers admitted their evaluations could not determine whether the appellant's mental illness affected his ability to determine right from wrong at the time of the offense. Kutnick told the jury that in order to determine whether or not the accused could appreciate the wrongfulness of his conduct, they should look to his behavior at the time of the offense.

The appellant's conduct immediately after the shooting supports the conclusion that the appellant knew he committed a wrongful act, notwithstanding his schizophrenic condition. After the shooting, the appellant left the scene of the crime, reloaded his gun, and was found hiding from the police in some bushes in a nearby park. The appellant complied with the orders of police officers and appeared to be aware of what was happening to him.

Having reviewed the evidence in the light most favorable to the implicit finding of the jury that appellant was sane at the time of the commission of his offense, and after reviewing all the evidence concerning the insanity defense, we find that a rational trier of fact could have found that the appellant failed to prove his insanity defense by a preponderance of the evidence. We overrule appellant's first point of error.

■ In his second point of error, the appellant contends there was insufficient evidence to show the cause of death was by shooting the victim with a firearm. To support his contention, the appellant directs the court's attention to a written death summary prepared by Dr. Garcia listing twelve complications leading to the death of Ramirez.

At trial, the prosecution introduced medical reports and the death certificate to prove Ramirez's cause of death. The death certificate stated the "immediate" cause of death was "gunshot wounds to the chest and head." The death summary introduced into evidence listed twelve complications including gunshot wounds and heart failure. The appellant contends that since the prosecution did not bring forward any expert testimony to explain these medical reports and since they failed to exclude every reasonable hypothesis of the cause of death, the State did not meet its burden. We disagree.

In the case before us, the record discloses that Ramirez was a healthy man prior to being shot. After Ramirez was shot and seriously wounded by appellant, he was transported to the hospital. The medical reports reveal that Ramirez, having never left the hospital, developed a series of complications which eventually contributed to his death. The death certificate set out "gun shot wounds" as the immediate cause of death. The evidence is sufficient, indeed overwhelming, that the victim died as a result of being shot with a firearm.

■ Appellant further argues that the evidence was insufficient to show the cause of death because the death certificate states the cause of death was by gunshot wounds to the "chest and head," whereas, the testimony showed Ramirez was shot in the jaw and lower back. This argument is without merit. At trial, Officer Brown testified that when he examined the victim at the scene there were two gunshot wounds, one was in the "*face area* with an entrance and exit wound on each side of his jaw," and the second wound "entered in the lower back and exited through his *chest.*" [Emphasis added]. The record, therefore, reveals the testimony at trial was consistent with the statement made in the death certificate. Appellant's second point of error is overruled.

Appellant's third point of error complains that the trial court erroneously permitted the State to introduce improper punishment evidence. Before the sentencing phase of the trial, the appellant made an objection to the trial court seeking to prevent the introduction of the testimony of State's witness Howard Blevins. Outside the presence of the jury, an objection was made to the

admissibility of the witness's testimony. The relevant portion of the transcript is as follows:

> MR. BOTARY: We're ready. Your Honor, before the jury is brought in, it's my understanding that Mr. May intends to offer testimony from a clinical psychologist that is assigned or works for the Texas Department of Corrections. And with the testimony of that individual, he intends to go into matters to show that a person who has a mental illness will be treated somewhat differently from the State Penitentiary. They have some sort of facility with 570 beds available and basically I feel the impression that Mr. May is trying to create with this witness is to show that if he is sent to the penitentiary no matter how long he's sent there, he will be confined in a mental unit type atmosphere. I think that's improper. It's just like making comments on the parole eligibility, and *I am not talking about the way the law specifies,* but specifically advising them on what will happen, what will not happen when he's in the penitentiary concerning his mental illness. And that's not something I don't think Mr. May can predict, the clinical psychologist can predict or whether a jury will predict, whether he will qualify for that program, whether he will stay there, if there's space for him, and I think it creates a fictional type atmosphere.
>
> THE COURT: Of course, you will be allowed to cross examine him and that will take care of any objections at the time they're made, but I would ask Mr. May to not leave the impression that these are known because they are certainly not known. Please bring in the jury. [Emphasis added].

The record reveals that after the jury was brought in and the announcements of ready were heard, the State called Howard Blevins to testify, but the appellant voiced no further objections.

On appeal, the appellant alleges that the trial court erred in allowing the State to admit evidence outside the perimeters of Article 37.07(3)(a) of the Code of Criminal Procedure. Article 37.07(3)(a) provides that after a finding of guilty, the State may introduce evidence of the defendant's prior criminal record, his general reputation, and his character. Tex.Code Crim.Proc.Ann. art. 37.07(3)(a) (Vernon Supp.1987). Appellant now claims that Blevin's testimony, which detailed how the jail provided the needs of mentally disturbed inmates, was improper.

To preserve error for review by this Court, it must appear from the record that the point of error presented on appeal is the same as the objection raised at trial. *Burdine v. State,* 719 S.W.2d 309, 319 (Tex.Crim.App.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987); *Adams v. State,* 669 S.W.2d 339, 343 (Tex. App.—Corpus Christi 1984), *aff'd on other grounds,* 707 S.W.2d 900 (Tex.Crim.App. 1986). In addition, it must appear from the record an adverse ruling was made by the trial court to preserve error. *Darty v. State,* 709 S.W.2d 652, 654 (Tex.Crim.App. 1986).

In the instant case, the appellant's objection at trial was vague at best. The appellant never objected to the evidence on the basis of Article 37.07, but essentially stated the proferred testimony would be speculative. In his objection, the appellant told the court he was not objecting to "the way the law specifies," but rather to the predictions or speculative nature of the possible testimony to be elicited from the witness.

We find that even if the appellant's objection at trial was the same as his assertion on appeal, the appellant preserved nothing for review. It is well established that when an objection is made at trial, the defendant must obtain a specific adverse ruling by the trial court to preserve his error for appeal. *Darty,* 709 S.W.2d at 654. The appellant's attorney did not obtain an adverse ruling from the trial court, and thus he preserves nothing for review.

The judgment of the trial court is AFFIRMED.