**Leon SANDERS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 08–89–00040–CR.**

Court of Appeals of Texas, El Paso.

May 17, 1989.

Discretionary Review Refused Aug. 30, 1989.

**646**

Randy Schaffer, Schaffer, Lambright, Odom & Sparks, Houston, Rod Ponton, El Paso, for appellant.

Steve W. Simmons, Dist. Atty. of El Paso County, El Paso, for appellee.

Before FULLER, WOODARD and KOEHLER, JJ.

## OPINION

FULLER, Justice.

This is an appeal from a denial of a writ of habeas corpus. We affirm the trial court's denial of the writ.

Leon Sanders was convicted of murder on June 3, 1981, and his punishment was assessed at fifty years' confinement in the Texas Department of Corrections. That conviction was appealed to this Court. In an unpublished opinion, we affirmed the conviction, and the Texas Court of Criminal Appeals denied review. *Sanders v. State*, No. 08–82–00032–CR (Tex.App.—El Paso 1983, pet. ref'd). A writ of habeas corpus was thereafter filed and relief granted in the United States District Court for the Western District of Texas. *Sanders v. Lynaugh*, 714 F.Supp. 834, (W.D.Tex.1988). Specifically, the Federal Court's finding was that Appellant was denied due process of law and a fair trial because the prosecutor repeatedly argued that the Appellant Sanders would be "cut loose" if the jury found him not guilty by reason of insanity. The case was remanded to the State trial court for further proceedings.

On remand to the trial court, the Appellant, on December 14, 1988, filed a pre-trial application for a writ of habeas corpus, urging that a retrial would violate his constitutional rights based on double jeopardy principles. The trial court denied the writ, resulting in this appeal.

Point of Error No. One asserts that the double jeopardy clause bars retrial because the evidence at Appellant's first trial established insanity as a matter of law.

Appellant relies on the Fifth and Fourteenth Amendments to the United States

Constitution and Article I, Section 14 of the Texas Constitution to support his position.

Appellant has aptly and succinctly stated the problems both sides were faced with in the initial trial, and we freely quote from his brief. Appellant had the burden of proving the affirmative defense of insanity by a preponderance of the evidence. The implicit finding of the jury was that Appellant was sane at the time of the offense. Thus, in determining whether he can be retried, this Court must decide whether the evidence at the first trial, viewed most favorably to the jury verdict, is sufficient to support the jury's rejection of Appellant's affirmative defense of insanity. This was established as the proper standard of review by the Texas Court of Criminal Appeals in *Van Guilder v. State*, 709 S.W.2d 178 (Tex.Crim.App.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986).

## FACTS OF THE CASE

On February 12, 1980, Appellant caused the death of Ismael Rivera by stabbing him thirteen times with a knife. The Appellant and the deceased were neighbors, living in adjoining apartments. The deceased lived in an apartment with Jose Perez and his wife. Appellant and the deceased had ongoing problems caused by Appellant's loud and late playing of music. On the date of the murder, Appellant had knocked on the door where the victim lived and asked Mrs. Perez for a flash for a camera. She noticed that he had a knife stuck in his belt and his hair was unkempt. She told him that she did not have a flash for a camera, and the Appellant left. This event occurred at about 8:00 p.m. She also indicated, however, that Appellant was very friendly on this occasion and that he behaved normally, not strange or crazy. On previous occasions she testified that the Appellant had come by to ask for cigarettes.

At approximately 10:00 p.m., the same evening, Jose Perez and his wife heard screaming. They went outside and saw Appellant repeatedly stabbing Ismael Rivera who had just arrived home. Jose Perez

returned to his apartment and obtained a rifle. In the meantime, Ismael Rivera got away from the Appellant and ran into Perez's apartment where he collapsed on the floor. Appellant pursued Rivera to the apartment door, and began yelling at Jose Perez, indicating that he was disturbed by Rivera's complaints about his (Appellant's) playing of music too loud. Jose Perez testified that Ismael Rivera had previously complained to Appellant about playing music too loud, resulting in irritation and anger by Appellant towards Rivera. Mrs. Perez also testified to disputes between Appellant and Rivera. After Appellant appeared at the apartment door, Jose Perez pointed his rifle at Appellant and told him to return to his own apartment. Appellant complied, and Jose Perez, with rifle in hand, pursued Appellant when he returned to his own apartment. Jose Perez returned to his own apartment and called police after the Appellant began throwing things at him.

When police arrived at the Appellant's apartment, they found him in an excited and agitated state; he was perspiring heavily and his whole body was shaking. Appellant had apparently removed his blood stained shirt and replaced it with a clean white shirt. Appellant, though he was obviously agitated, initially took a very protective stance when confronted by the police. He told them that they could not enter his apartment without a search warrant, and he refused to step outside. He then informed the officers that he was going to get dressed and asked them to come in. At this point, police officer Salas advised Appellant that he was under arrest for aggravated assault. Appellant did not resist arrest.

Officer Salas described the Appellant's apartment as in shambles, with books, clothing and garbage scattered throughout. Detective Amos described the apartment as in "complete disarray." They found water standing on the bathroom floor, the commode was plugged up, the beds were torn apart, the sofa cushions were scattered on the floor and the kitchen was "a mess." However, both officers testified that Appel-

lant was not acting crazy at the time of the arrest. Officer Salas testified that in his opinion, based on observations that night, Appellant was sane at the time of the arrest. Ismael Rivera later died as a result of the stab wounds.

## MEDICAL EXPERTS

Appellant called three medical expert witnesses at the murder trial, and without question, their testimony revealed that Appellant Leon Sanders was, indeed, a troubled man and had been for many years previous to the death of Ismael Rivera.

Dr. Ben Passmore, a qualified psychiatrist, testified that Appellant was first diagnosed as a paranoid schizophrenic in 1965, and was admitted to Camarillo State Hospital in California. In 1969, while in the military service, Appellant was again diagnosed as schizophrenic at William Beaumont General Hospital in El Paso, Texas. He received a medical discharge from the Army because of this condition and was found to be 100 percent disabled. Shortly thereafter, in 1970, the Appellant was admitted to an Illinois State hospital where he was treated for schizophrenia. Appellant also was seen at Veterans outpatient clinics in Los Angeles and Chicago and had six separate hospitalizations in the early 1970's.

Dr. Passmore first examined Appellant when he was admitted to R.E. Thomason General Hospital in El Paso in 1975; he diagnosed Appellant as a paranoid schizophrenic and found him "out of touch with reality." Appellant was confined to the Rusk State Hospital from July 1975 through January 1976. His illness was in remission in the spring of 1976 to the extent that he was able to function in the "real world." In the summer of 1976, however, Appellant was again very psychotic, actively hallucinating and non-verbal. By October 1977, Appellant's condition had deteriorated to a state of "catatonic excitement"; he was severely disorganized and constantly on his feet.

Dr. Passmore's first contact with Appellant after the date of the present offense was April 28, 1980, at which time Appellant exhibited all the signs of severe schizophrenia. Dr. Passmore expressed the opinion that, on February 12, 1980, Appellant was suffering from a mental disease or defect, that is "the same mental illness he suffered from all along"—severe schizophrenia—and that, as a result of that mental defect, Appellant was not capable of conforming his conduct to the requirements of the law. But on cross-examination, Dr. Passmore admitted that a chronic schizophrenic, such as Appellant, may have recurrent episodes of mental illness with periods of normalcy (i.e., periods in which he is able to conform to the law) in between.

Appellant's other expert witnesses, Dr. Jack Butler and Dr. Randolph Whitworth, examined him for the first time after his arrest. Each concluded, as did Dr. Passmore, that Appellant was a chronic schizophrenic, that he was suffering from that condition on February 12, 1980, and that in all reasonable medical probability, he was legally insane at that time. Drs. Butler and Whitworth also agreed with Dr. Passmore, that persons such as Appellant may have recurrent episodes of mental illness with periods of normalcy.

These expert witnesses conceded that, insofar as Appellant's legal insanity defense was concerned, the key issue was whether Appellant was in a period of active psychosis (and thus probably legally insane) or in a period of remission (legally sane) at the time of the murder. Each expert also admitted that he was not present to observe Appellant's actions on that night, and that it was up to the jury to match up the factual observations of the actual witnesses with the psychiatrists' descriptions of Appellant's illness and the manner in which it could be expected to manifest itself.

Dr. Passmore testified that a completely unprovoked attack by a schizophrenic was indicative of the existence of paranoid delusions, and it could, thus, be assumed that the assailant was legally insane at the time of the attack. However, if a pre-existing conflict between the parties was shown—as it was in the instant case—such an attack would more likely be the result of con-

scious action on the part of the assailant, based upon real hostility for the victim.

Dr. Butler also indicated that Appellant's actions on the night of the murder were consistent with normal behavior. Of particular significance, in addition to the existence of a prior conflict, were Appellant's actions in fleeing from the threat of a more powerful weapon (i.e., Jose Perez's rifle), his demand for a search warrant from the police officers and his submission to arrest. The experts having conceded that psychiatry is not an exact science, testified that it was possible that their diagnoses of Appellant's condition were erroneous.

Both Drs. Butler and Whitworth indicated that their diagnoses were based primarily upon their observations of Appellant during examinations which lasted less than two hours. Dr. Butler noted that some of Appellant's symptoms were consistent with a paranoid personality disorder, a less severe mental disorder consistent (unlike the more severe disorder schizophrenia) with legal sanity. Dr. Whitworth indicated that there was a possibility that Appellant was faking symptoms of psychosis during the examination, though he believed Appellant's illness was real. Even Dr. Passmore, who treated Appellant intermittently over a six-year period, admitted he had considered the possibility that Appellant was feigning mental illness, although he doubted it.

### STATUS OF THE LAW

█ The Appellant had the burden of proving, by a preponderance of the evidence, that at the time of the killing he did not know that his conduct was wrong because he suffered from a severe mental disease or defect. Article 8.01(a) of the Texas Penal Code Ann. (Vernon Supp. 1989). The issue of insanity " 'is not strictly medical, and expert witnesses, although capable of giving testimony that may aid the jury in its determination of the ultimate issue, are not capable of dictating that issue.' " *Schuessler v. State*, 719 S.W.2d 320, 328–329 (Tex.Crim.App.1986); *Graham v. State*, 566 S.W.2d 941, 949 (Tex. Crim.App.1978). The circumstances of the

offense, and the life experiences of the defendant may also aid the jury in considering whether a defendant was insane at the time he committed an offense. *Schuessler*, 719 S.W.2d at 329; *Ross v. State*, 153 Tex. Crim. 312, 316, 220 S.W.2d 137, 139 (1949). When testimony of either experts or lay witnesses conflict on the issue of insanity, the jury is the sole judge of the weight and credibility to be given to the evidence. *Schuessler*, 719 S.W.2d 329; *Madrid v. State*, 595 S.W.2d 106, 118 (Tex.Crim.App. 1980).

### CONCLUSION

█ Applying these principles to the facts of this case, it appears that a rational jury could have properly concluded that Appellant was legally sane at the time of the offense. The testimony of police officers and witnesses who observed Appellant shortly before and after the incident revealed that Appellant behaved normally. The medical experts who diagnosed Appellant as schizophrenic agreed that it was possible that, at the time of the assault upon the victim, Appellant could have been in remission and able to conform his conduct to legal requirements. Each expert acknowledged that he was not present at the time of the incident, and that it was up to the jury to determine whether or not Appellant was legally insane based upon his behavior at the time of the offense. *Morris v. State*, 744 S.W.2d 290, 295–296 (Tex.App.—Corpus Christi 1987, PDRR); *Baker v. State*, 728 S.W.2d 869, 871 (Tex. App.—Houston [1st Dist.] 1987, PDRR); *Plough v. State*, 725 S.W.2d 494, 500 (Tex. App.—Corpus Christi 1987, no pet.). A rational jury could have looked to Appellant's actions of removing the blood stained shirt he wore at the time of the assault, demanding a search warrant from police officers who confronted him, and then the jury could have concluded that Appellant knew he had committed a wrongful act. A jury could consider the fact that Appellant spoke of pre-existing conflicts with his victim to his neighbor, Jose Perez, shortly after the assault. Also the fact that Appellant retreated when threatened by Jose Perez's rifle and that he cooperated with

police officers after his arrest. These are just some of the facts that a jury could consider which might result in a conclusion by the jury that Appellant was not under the influence of a psychosis at the time of the incident. *Schuessler,* 719 S.W.2d at 330; *Morris,* 744 S.W.2d at 296; *Plough,* 725 S.W.2d at 500. The State in the instant case was able to impugn, to a limited degree, the reliability of psychiatric diagnosis in general and the credibility of the specific diagnoses by the experts. We have before us uncontradicted evidence that Appellant was suffering from a mental disease or defect, but there was also evidence that raised a question, properly for the jury, of whether Appellant knew right from wrong or whether he was able to conform his conduct to the requirements of the law he violated.

Point of Error No. One is overruled.

Point of Error No. Two asserts that the double jeopardy clause bars retrial of Appellant because Appellant's conviction was reversed due to prosecutorial misconduct.

 Appellant's conviction was reversed and sent back to the trial court because of prosecutorial misconduct. Appellant recognized that in *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the federal standard is that the double jeopardy clause of the United States Constitution bars retrial following a mistrial where the prosecutor's conduct was intended to provoke defendant into moving for a mistrial. However, no mistrial was requested in the Appellant's original trial. No claim was made in the trial court on the grounds of double jeopardy due to prosecutorial misconduct. Appellant is raising this ground for the first time on appeal, and we have no original jurisdiction to grant habeas corpus relief in criminal law matters. *Ex parte Lewis,* 663 S.W.2d 153, 154 (Tex.App.—Amarillo 1983, no writ). But, even considering this point of error, Appellant is urging that a less stringent standard for relief should prevail under the double jeopardy clause of our Texas Constitution. We disagree. In the instant case, there was no finding by the federal judge that the prosecutorial misconduct was intentional. His finding was that the prosecutor's misconduct was improper, but he did not find that it would bar Appellant's retrial. *Tenery v. State,* 680 S.W.2d 629, 633–634 (Tex.App.—Corpus Christi 1984, PDRR).

Point of Error No. Two is overruled.

We affirm the trial court's denial of the writ of habeas corpus.