# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-03-00191-CR
NO. 03-03-00192-CR

**Larry Ralph Elliott, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT
NO. 02-256-K277 & 02-257-K277, HONORABLE KEN ANDERSON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

On January 15, 2002, appellant Larry Ralph Elliot drove his truck into a grocery store, killing one woman and seriously injuring another. He was indicted for murder and aggravated assault. *See* Tex. Pen. Code Ann. §§ 19.02 (West 2003), 22.02 (West Supp. 2004-05). On February 13, 2002, a jury found appellant incompetent to stand trial but likely to regain competence with treatment. On January 13, 2003, another jury was empaneled to re-examine appellant's competency and, after a hearing, found appellant competent to stand trial. On February 3, trial began before a third jury, and appellant pleaded not guilty by reason of insanity. The jury found appellant guilty of both counts, sentencing him to life imprisonment for the murder and twenty years' confinement for the assault. On appeal, appellant contends that the evidence is legally and factually insufficient to

support the finding that he was competent to stand trial and that the evidence is factually insufficient to support the rejection of his insanity defense. We affirm the judgments of conviction.

## Competency to Stand Trial

In his first and second issues on appeal, appellant contends that the evidence is legally and factually insufficient to support the jury's finding that he was competent to stand trial.

### *Standard of Review*

A person is incompetent to stand trial if he either lacks a sufficient present ability to consult with his attorney with a reasonable degree of rational understanding or lacks a rational and factual understanding of the proceedings against him.[1] Tex. Code Crim. Proc. Ann. art. 46B.003(a) (West Supp. 2004-05). A defendant is presumed to be competent unless proved otherwise by a preponderance of the evidence. *Id*., art. 46B.003(b). However, once a defendant has been adjudicated incompetent, the burden shifts to the State to prove beyond a reasonable doubt that the defendant has regained competence to stand trial. *Arnold v. State*, 873 S.W.2d 27, 30 (Tex. Crim. App. 1993); *Manning v. State*, 730 S.W.2d 744, 748 (Tex. Crim. App. 1987).

When the State bears the burden in a competency hearing, we review the factual sufficiency of the evidence supporting a finding of competence by asking whether, considering all

---

[1] At the time of appellant's conviction, incompetency hearings were governed by section 46.02 of the code of criminal procedure. *See* Act of May 26, 1999, 76th Leg., R.S., ch. 561, § 1, 1999 Tex. Gen. Laws 3092, 3092-93 (repealed, current version at Tex. Code Crim. Proc. Ann. art. 46B.003). In 2003, the legislature repealed section 46.02 and enacted chapter 46B in its place. *See* Tex. Code Crim. Proc. Ann. arts. 46B.001-.171 (West Supp. 2004-05). The language of article 46B.003 is identical to that used in section 46.02, § 1A, *see id*. art. 46B.003(a), therefore we will cite to the current statute for convenience.

the evidence in a neutral light, the jury was rationally justified in finding competence beyond a reasonable doubt. *See Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004) (discussing and clarifying standard of review applied to beyond-a-reasonable-doubt burdens of proof). The evidence may be insufficient if evidence of competence is too weak to support a finding of competence when viewed alone or if evidence of incompetence is so strong that the beyond-a-reasonable-doubt standard could not have been met. *Id*. at 484-85. Evidence may "preponderate" in favor of competence but still be outweighed by contrary proof and thus be factually insufficient under the beyond-a-reasonable-doubt standard. *Id*. at 485.

*Factual Summary*

The parties agree that appellant suffers from paranoid schizophrenia, dating back at least to 1988 or 1989. Dr. Michael Jumes was Chief Psychologist of the North Texas State Hospital's[2] Competency Restoration Program when appellant was admitted to the hospital after being found incompetent in February 2002. Jumes testified that while at the hospital, appellant received treatment that included medication, formal training to help him understand court procedures, stress management, and classes to help him understand his medical condition and medications. Jumes testified that appellant made substantial progress and, as of April 24, 2002, was legally competent and displayed an understanding of the difference between felony and misdemeanor charges, the possible ranges of punishment, the consequences of being found guilty, and basic legal concepts like use of evidence, plea bargains, and the roles of juries, judges, and attorneys. Appellant

---

[2] Also referred to as the Vernon State Hospital.

was discharged on May 17, 2002. Jumes testified that a person can slip in and out of competence, which is why Jumes recommended that appellant receive continuing psychiatric services.

Dr. Mary Anderson was appointed by the trial court to evaluate appellant's competency. She saw appellant five times, first in late January 2002 and, most recently, shortly before the January 2003 competency hearing. Anderson testified that in January 2002 appellant was having severe symptoms such as a high degree of paranoia, which led him to refuse to eat because he believed his food was poisoned, and intense auditory hallucinations on which he was very focused. Although appellant factually knew what the situation was and who the various people were in the courtroom, he could not interact in a reasonably coherent way due to his distracting auditory hallucinations. Anderson testified that appellant's symptoms had since lessened and, although appellant still reported hearing voices, he understood that "the voices were coming from his head," and Anderson believed he was competent to stand trial in January 2003.

The State also called Annette Hawkins, who oversees the medical department of the Williamson County Sheriff's Department. Hawkins testified that appellant's records show that while in jail after his hospital discharge in May 2002 he had received and taken his medications as prescribed.[3] Finally, the State introduced a letter written on May 2, 2002, by Dr. Thomas Wiman, Competency Program Psychiatrist for the North Texas State Hospital, stating that it was his opinion that appellant was competent to stand trial.

---

[3] Hawkins did not have all of appellant's records from several months he spent in a privately run jail in the summer and fall of 2002, and the records she had show that for several months in 2002 appellant's medications were cut in half by the private jail's psychiatrist. Appellant was brought back to Williamson County in October 2002 so he could be monitored more closely, and his medications were increased again.

*Discussion*

Appellant asserts that no rational jury could have found beyond a reasonable doubt that he was competent to stand trial, arguing that, except for Dr. Anderson, the doctors had not examined him recently enough to prove that he was currently competent. We disagree. Although Jumes and Wiman formed their opinions in late April and early May 2002, their opinions were relevant in determining whether appellant had responded to competency treatment. Anderson testified that she saw appellant for about an hour the week before the competency trial in January 2003. Based on that and her other examinations of appellant, Anderson opined that appellant was competent. Jumes believed appellant could maintain competency with medication and psychiatric care, and there was evidence that appellant had continued to take his prescribed medication. We hold that the State met its burden and that the evidence is both legally and factually sufficient to support a finding, beyond a reasonable doubt, that appellant had regained his competence and was competent to stand trial. We overrule appellant's first and second issues on appeal.

**Sanity at the Time of the Offense**

In his third issue, appellant contends that the evidence is factually insufficient to support the jury's rejection of his insanity defense.

*Standard of Review*

Insanity is an affirmative defense to prosecution. Tex. Pen. Code Ann. § 8.01(a) (West 2003). When a defendant asserts an affirmative defense, he bears the burden of proof on that

5

issue, and in reviewing the evidence supporting a jury's finding on an affirmative defense, we consider all of the evidence and determine whether the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Zuniga*, 144 S.W.3d at 482; *Bigby v. State*, 892 S.W.2d 864, 875 (Tex. Crim. App. 1994). A defendant pleading insanity who has not already been adjudicated insane has the burden of proving by a preponderance of the evidence that he was insane at the time of the offense. *Manning*, 730 S.W.2d at 748; *see* Tex. Code Crim. Proc. Ann. art. 46.03, § 1(c) (West Supp. 2004-05).

A person is considered legally insane if, as a result of a severe mental illness, he did not know at the time the offense was committed that his conduct was wrong. Tex. Pen. Code Ann. § 8.01(a). Medical insanity is distinguishable from legal insanity and a person may be *medically* insane, yet still be able to distinguish right from wrong and thus be *legally* sane. *Taylor v. State*, 856 S.W.2d 459, 468 (Tex. App.—Houston [1st Dist.] 1993), *aff'd*, 885 S.W.2d 154 (Tex. Crim. App. 1994) (citing *Graham v. State*, 566 S.W.2d 941, 948 (Tex. Crim. App. 1978)). The question is not whether a defendant knows his act was "morally" wrong, but is whether he "understood the nature and quality of his action and whether it was an act he ought to do"; in other words, whether he knew the act was wrong by societal standards. *Bigby*, 892 S.W.2d at 878.

The determination of whether a defendant was legally insane at the time of the offense is an issue "exclusively within the province of the jury," and it is for the jury to determine the weight and credibility of witness testimony and to determine whether to accept or reject all or any part of the opinion testimony given by experts and other lay-witnesses. *Taylor*, 856 S.W.2d at 468; *see Graham*, 566 S.W.2d at 952; *see also Aschbacher v. State*, 61 S.W.3d 532, 537 (Tex. App.—San

6

Antonio 2001, pet. ref'd) (jury acted reasonably in its resolution of conflicting evidence as to defendant's sanity); *Sanders v. State*, 771 S.W.2d 645, 649 (Tex. App.—El Paso 1989, pet. ref'd) (jury is sole judge of weight and credibility to be given conflicting expert testimony).

*Factual Summary*

The parties agree that appellant suffers from paranoid schizophrenia and has delusions that people are trying to take his land and stop him from owning horses and that several doctors had in the past conspired against him, rendering him sterile and implanting in his teeth microphones that broadcast his thoughts. Appellant has suffered from his mental illness since at least 1987 and eventually had to stop working and go on medical disability leave. In the fall of 2001, appellant's doctor, Dr. James Kreisle, began changing appellant's medication because appellant was suffering from side effects and his symptoms were returning. To effect the drug change, Kreisle gradually decreased the dosage of the old medication, called Serentil, as he increased the dosage of the new drug, called Seroquel.

Michael Williams was present when appellant drove his truck into the grocery store. Williams described appellant's demeanor after the offense, saying that appellant seemed dazed and expressionless, "like he had just gotten in trouble. I mean like a kid that just got caught or something with his hands in the cookie jar or whatever. He just kind of stood there, you know, like he had done something wrong." A second witness described appellant as having a "blank look on his face." A third witness said that after the incident, appellant calmly admitted to being the driver. In an interview with police officers after the offense, appellant stated he was going to the store to buy groceries when he "snapped." He said he did not know what happened, did not know why he was

7

upset, and did not remember driving into the store. He said, "I guess I must have just went crazy. That's all I know." Appellant told the police that he had schizophrenia and had regular doctor appointments because he "was hearing voices" that were trying to take his property. Asked what made him angry, he said, "Somebody did something to me and my life is over with." He also told the police that he was afraid to sleep. One of the interviewing officers testified that he believed appellant remembered more than he admitted and was ashamed of what he had done.

Psychiatrist Dr. Richard Coons testified that he examined appellant the day after the offense. He also reviewed appellant's medical records, records and statements about the offense, and appellant's police interview. He testified that he believed appellant was legally sane at the time he committed the offense. Coons testified that appellant felt that he had been harmed by doctors and others, grew angry, could not figure out a solution, and committed "an angry general act," driving into the store. Coons said that this "generic act of anger" was combined with appellant's delusions, but he did not believe appellant was unable to understand that his act was wrong. In other words, appellant knew his action was wrong, but his anger overwhelmed him; Coons compared appellant's act to getting in a fight or breaking something and regretting it later. Coons said appellant's failure to consider consequences is not an inability to understand right and wrong. Coons also testified that he did not believe appellant was unable to think things through and stated that an urge to exact revenge for imagined harm does not equate to insanity. Coons pointed to appellant's statements— that he knew he had "messed up," that he had stopped himself from acting on violent urges in the past, and that he had decided not to hit a police officer because he would get in trouble—as showing that appellant "recognized the ramifications of doing those violent acts and decided against them."

8

Coons said it appeared that appellant "had an irresistible impulse and acted on it," noting that the irresistible impulse concept had been removed from the insanity statute about twenty years earlier.[4] Coons testified that, even if appellant's medications were not effective when he committed the offense, he still would have known that it was wrong to drive into the store. Coons believed appellant's act, though "not highly thought out," was intentional.

Dr. Anderson, the court-appointed psychiatrist, testified that she examined appellant five times and reviewed some of his medical records, police reports, and his police interview. Anderson agreed that appellant suffers from a severe mental illness but testified that he nonetheless knew his conduct was wrong and that he was sane at the time he committed the offense. She based her opinion on statements by appellant that: he felt remorse for committing the offense; if he had thought about it he would have controlled himself; he knew it would be wrong to kill the doctors he believed had conspired against him; someone would stop him, and he would get in trouble if he tried to bring a weapon to an appointment with one of the doctors; and he "wanted to go after" those he believed had harmed him but "didn't know how to do it" or how "to get away with it." Appellant told Anderson, "I made a mistake. Instead of going after somebody that done me wrong . . . I just made a mistake. . . . I wasn't thinking and went in the wrong place." Anderson testified that

---

[4] Whether a defendant is unable to conform his conduct to the law is no longer an element of the insanity inquiry. *See* Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 896 (element deleted by Act of May 25, 1983, 68th Leg., R.S., ch. 454, § 1, 1983 Tex. Gen. Laws 2640, 2640).

appellant said he was angry at the time of the offense, and she believed that when he said he "snapped," he meant that he acted on his anger. Appellant told Anderson that if his mother or the police had been present, he would not have committed the offense. Anderson summarized her opinion as follows: "I think he was mentally ill; and I think he knew that hurting somebody was wrong; and I think he knew driving into the store was wrong."

Psychiatrist Dr. Scott Murry testified on appellant's behalf. Murry treated appellant while he was in jail a total of seventeen times; the first session was on January 23, 2002. Murry testified that some sufferers of paranoid schizophrenia believe they are hearing voices and cannot be talked out of that belief. Schizophrenia is treated through medications that are supposed to stop sufferers from hearing voices, allow them to give up their delusions, and help with concentration and organization. Murry testified that if a person stopped taking his medications, he would expect auditory hallucinations and other symptoms to return. He also stated that long-prescribed drugs sometimes lose effectiveness over time. He testified that a patient's eating, sleeping, and bathing less, worrying and acting agitated, and having "a general going downhill perception," could indicate the return of auditory hallucinations or paranoia.

Murry testified that he believed that on January 15, 2002, appellant "was unaware that his actions were wrong" and that he was statutorily insane when he drove his truck into the grocery store. Murry came to that conclusion because appellant said he was not thinking about potential consequences and did not think anyone would get hurt; he did not realize what had happened until he was already inside the store; he did not know how the truck stopped; he only went to the store for groceries; he did not think anyone was inside the store; he was uncertain as to why he was arrested;

10

he did not know the difference between being charged with a crime and being committed to a psychiatric hospital; the worst consequence he could think of was losing his driver's license; and he should have attacked the doctors he believed had harmed him rather than driving into the store. Murry viewed the videotape of appellant's police interview and was struck by appellant's "lack of insight into his role and what had occurred." Appellant seemed shocked, surprised, and saddened that there had been any injury associated with his actions. Murry also testified that appellant's use of the word "snapped" was meaningful because any of us, overwhelmed by stress, "could, in fact, snap and take actions without our own awareness." Murry admitted that his sessions with appellant were treatment-related and not aimed at determining appellant's legal sanity.

Appellant took his medication about 9:00 p.m. on January 14. He was arrested immediately after committing the offense and did not receive any medication on January 15. Murry testified that appellant's symptoms of schizophrenia were probably worse on January 16, after missing his medication on the 15th. He believed that appellant had at least "a sane moment" on January 16, the day after the offense, when he was interviewed by Dr. Coons and stated that he felt bad and knew he "messed up." Murry believed that appellant was sane on January 30, when Murry saw appellant for the second time. Murry testified that people can lapse in and out of sanity, depending on factors such as stress or medication levels.

Psychiatrist Dr. Joel Feiner reviewed appellant's medical records and his interview with the police and interviewed appellant and his parents. Feiner believed the Seroquel did not have the same level of control as the Serentil, resulting in a return of delusions and hallucinations "in a much more dramatic and pervasive way." Feiner thought Kreisle should have maintained appellant's

11

Serentil levels until the Seroquel was built up to an adequate level and should have monitored appellant more closely, rather than seeing appellant every four months during the transition in medications. Feiner testified that appellant's use of the word "snapped" was significant and meant that "there was a period of unknowing, where he was oblivious." Feiner testified that he believed appellant did not know that his conduct was wrong at the time he drove his truck into the store. He testified that appellant was insane when he committed the offense and that he believed appellant was under-medicated, which allowed his delusions and external stressors to cause him to snap. Feiner also believed that shortly after the incident, appellant was "jolted into realizing what he had done, and at that point may have realized that it was wrong"; he testified that people can lapse in and out of sanity very quickly. Feiner did not think it was possible to separate a personality trait that desired revenge from "the pervasiveness" of appellant's mental illness, stating, "[T]he idea that there is a personality acting independent of the illness to me is a myth." Feiner did not think appellant's anger was independent of his delusions and that "all [appellant] had in his mind at [the time of the offense] were delusions." Feiner stated under cross-examination that he had reviewed many of appellant's records and "formed an opinion and had a mandate from" defense counsel before he met appellant for the first time.

Psychiatrist Dr. Stuart Crane interviewed appellant the day after the offense and spoke to Dr. Kreisle and appellant's mother. After speaking to appellant, Crane switched appellant from Seroquel to a drug called Risperdal because he, like Dr. Feiner, did not believe the prescribed Seroquel was "an effective dose." Crane testified that Dr. Anderson's knowledge of Seroquel dosages "at best was seriously out of date." Crane stated that on January 16 appellant was suffering

12

from paranoid delusions but did not give an opinion as to appellant's sanity because he is not a forensic psychiatrist and did not feel qualified to do so.

*Discussion*

Appellant argues that he showed by a preponderance of the evidence that he was legally insane, pointing to testimony by Drs. Murry, Feiner, and Crane that his medications were not effective and that he was in the throes of his delusions. Additionally, Murry and Feiner testified that appellant did not know right from wrong when he committed the offense. However, Drs. Coons and Anderson testified to the contrary, stating that they believed appellant knew his conduct was wrong. Coons believed that appellant acted on his angry feelings, pointing out that even if appellant felt an uncontrollable impulse to act on his violent urges it did not mean he was legally insane. Both doctors testified that appellant made statements that led them to believe he knew his act was wrong.

All of the doctors agreed that appellant suffers from a serious mental illness, but there was a difference in opinion as to whether he knew right from wrong at the time of the offense. It was for the jury to hear the evidence and determine whether appellant was legally insane. *See Graham*, 566 S.W.2d at 952; *Taylor*, 856 S.W.2d at 468. We will not second-guess the jury's determinations on matters of credibility or weight to be given witness testimony. *See Aschbacher*, 61 S.W.3d at 537; *Sanders*, 771 S.W.2d at 649. Two doctors testified that they believed appellant was insane when he drove his truck into the grocery store. However, two doctors testified that they believed appellant was legally sane when he committed the offense. The evidence is factually sufficient to support the jury's rejection of appellant's insanity defense. We overrule appellant's third issue.

13

## Conclusion

Having overruled appellant's issues on appeal, we affirm the judgments of conviction.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   April 14, 2005

Do Not Publish