**Richard PLOUGH, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–86–180–CR.**

Court of Appeals of Texas,
Corpus Christi.

Feb. 19, 1987.

---

James R. Lawrence, Corpus Christi, for appellant.

Alfred Montelongo and Grant Jones, Dist. Attorney's Office, Corpus Christi, for appellee.

Before NYE, C.J., and UTTER and KENNEDY, JJ.

## OPINION

NYE, Chief Justice.

Appellant was convicted of murder and sentenced to thirty years' imprisonment. At trial, he asserted the defense of insanity. On appeal, he challenges the jury's implicit finding against this affirmative defense, and argues that no rational trier of fact could have found that he failed to establish his insanity by a preponderance of the evidence. We affirm.

A recitation of those facts relevant to the defense of insanity is necessary. The facts surrounding the offense are basically undisputed. Appellant and his brother, Lonnie Plough, were both machinists at the same shop. On June 6, 1985, appellant did not go in to work. During the noon hour, he drove to the machine shop and waited for his brother to return from lunch. When his brother returned, appellant shot him in the face with a shotgun and killed him. No one else witnessed the shooting.

Appellant retrieved the spent shell, returned to his car, and drove to his parents' home. A co-worker called appellant there and asked him why he did it. Appellant replied, "I don't know." Appellant then called the police and confessed that he had killed his brother.

He told the dispatcher:

C [Caller]—Yea, I'd like to confess about a murder.

D [Dispatcher]—Yes, sir.

C— yea [sic] I shot, my brother.

D— You shot Your [sic] brother? when [sic] did this happen?

C— today. [sic]

\*　　\*　　\*　　\*　　\*　　\*

D— and [sic] you want to turn yourself in [sic] Matt [appellant]?

C— Yes.

D— Ok. Where are you at?

C— I'm at my parent's house.

\*　　\*　　\*　　\*　　\*　　\*

D— ... What happen [sic] out there [sic] Matt?

C— [inaudible] He's been bugging me for a long time ... for a long time.

D— Yeah

C– And ah, y'all gonna think I'm nuts, but ... he ... was Satan and ... ah ... he killed my son.

D– Hhe [sic] killed you [sic] Son [sic]?

C– Yes.

D– Did you shoot him or what happened?

C– Yeah, I shot him.

\*    \*    \*    \*    \*    \*

D– So it's been going on for some time now?

C– Yes. Yes [sic] a long time.

\*    \*    \*    \*    \*    \*

D– [Another Dispatcher]—You said your brother killed you [sic] son. How old was you [sic] son?

C– 5.

D– 5 years old. When did this happen. [sic]

C– The other day.

D– the [sic] other day? this [sic] work? or ...

C– You won't believe me, but ...

D– Well, I might.

C– he [sic] was really Satan ... and all [sic]

D– Your son was or your brother?

C– My brother.

D– Your brother.

C– .. and ah, he cut his head off last night in Oklahoma with magic [inaudible] [sic].

\*    \*    \*    \*    \*    \*

C– I didn't want to do it but he pushed and pushed and pushed and pushed..... on and on.

D– Wash [sic] he harassing you. [sic]

C– Everyday [sic].

Sergeant Kevin Sullivan of the Nueces County Sheriff's Department was first to arrive at appellant's parents' home, and arrested appellant. He testified he observed nothing abnormal about appellant. Appellant showed him exactly where the gun was located. He had put the gun in the attic by using a ladder from the garage. Appellant told Sullivan, "The gun I used to kill my brother is on the right-hand side." The twelve-gauge shotgun was found in the attic along with five other guns. Then appellant took Sullivan to the front bedroom and showed him three shotgun shells (two live and one spent) setting on the corner of a sewing machine. Appellant motioned and said, "That's the one I used to kill my brother. I picked it up before I left." Sullivan characterized appellant's overall demeanor as remorseful, cooperative, calm, and responsive. He testified that he felt appellant's mannerisms were normal considering the context of the situation.

Lt. William Edge of the Sheriff's Department supervised the investigation. Lt. Edge characterized appellant as cooperative, polite, coherent, and understandable. He testified appellant spoke slowly and deliberately. He said appellant told him that he killed his brother because his brother was always bugging him and because his brother was Satan. Appellant then gave a voluntary statement. Edge stated that appellant was cooperative and responded to all the questions asked of him. He felt appellant was not behaving abnormally or out of the ordinary given the context of the situation. He said appellant even found a typographical error in his written statement, which was corrected. Finally, he testified that as they were leaving the interrogation room, appellant said, "I'm sorry it had to come to this, but I had to do it."

Appellant's statement, admitted into evidence, was as follows:

My brother Lonnie and I both work at [_____] Machine Shop as machinists.... I was suppose to go to work today, June 6, 1985, at 8:00 a.m. but I felt faint because I had stabbed myself in the chest last night ... I stabbed myself because my brother Lonnie killed my son. Lonnie killed my son David who is five years old last night in Tulsa, Oklahoma. Lonnie killed my son because Lonnie is Satan. He beheaded my son by magic. I knew my son had been killed because I was there fighting Satan.

\*    \*    \*    \*    \*    \*

I decided to shoot my brother Satan. I drove to my house ... and got my 12

gauge shotgun.... It was loaded with three buckshot shells. I then drove out to [_____] Machine Shop.... I parked in the little parking lot out front and waited for my brother Lonnie.... At about 1:00 p.m. I saw Lonnie pull into the parking lot in his blue Chevette. He parked a couple of cars down from me. He knew what I was going to do but my father God made him come. Lonnie got out of his car and started to walk toward the street and he was sneering. I got out of my car with the shotgun and I yelled him, hey stupid. He started to turn his head toward me and I shot him one time in the head. I put the shotgun to my shoulder, pointed it at him, and pulled the trigger. I put the gun back in the front seat of my car and I looked around on the ground for the shell because the shotgun is automatic and it ejected it. I found the shell and put it into the console in my car. I drove away an [sic] went back to my parents house on Salem Street. I took the gun inside the house and the shell [sic] and put the shell in the bedroom on a sewing machine with the two other shells that I took from the shotgun. I cleaned the gun with a Hoppe's gun cleaning kit and put it in the attic with some of my dad's other guns. I sat down at the kitchen table and the telephone rang. It was one of the guys from work named Sobie. He told me that I ought to give myself up and I told him that I would think about it. [sic] for a little bit and hung up. I decided to call the police department and I told them I wanted to confess to a murder.

Appellant's roommate for about six months before the shooting had known appellant for five-and-a-half years. He testified that appellant hated his brother; that the two were always quarreling, especially at work. He testified that, while Lonnie was successful and had a great personality and was successful at work and at sports, appellant was not popular. He had a bad temper, and was constantly arguing with and intimidating people. The roommate stated that appellant could not stand his brother's success and that the rivalry be-

tween the two had been going on all their lives. He testified that appellant used marijuana and alcohol regularly.

The roommate testified that he felt appellant was normal, otherwise he would not have lived with him. However, on cross-examination, he stated that he had noticed a change in appellant about three weeks before the shooting.

Several of appellant's co-workers testified. Basically, they stated that appellant was a good machinist, but was intolerant and quick-tempered. He argued frequently with others, and particularly with his brother. The shop manager testified that Lonnie teased appellant constantly. One co-worker testified that appellant got so mad at Lonnie once that he pulled a knife on him. On cross-examination this same co-worker stated that he had noticed a drastic change in appellant's personality about a week before the shooting. He said appellant had become "real silent" and "weird lately."

Heziquio Rodriguez, a classification officer in the sheriff's office, interviewed appellant when he was brought to jail. He testified appellant was in a state of shock when he was brought in, but he felt his condition was normal considering the circumstances. He said appellant indicated to him that he had a self-inflicted wound, that he heard voices which commanded him to do things, and that he was under the influence of the devil. Rodriguez testified the wound to appellant's chest was superficial, but considering the nature of the crime and appellant's expressed hallucinations, he determined appellant should be admitted to a hospital for psychiatric observation as a precautionary measure. Rodriguez stated, however, that during the time he observed him, appellant was responsive and otherwise rational. Appellant did not appear to him to be in an active psychotic or schizophrenic process.

Officer Garza, of the Sheriff's Office, transported appellant from the jail to the hospital that day and was able to observe him for three or four hours. He testified appellant seemed normal to him, except that he was a bit dazed. As Garza placed

appellant in the holding cell at the hospital, appellant repeatedly said, "The devil made me do it ... He killed my son and nobody did nothing about it," in a laughing and joking manner.

The defense presented three witnesses, appellant's mother and two pyschiatrists. His mother testified that appellant had changed when he was fifteen or sixteen, that he began hanging around with the "wrong crowd" and doing drugs, and that he would never talk about his problems. She said that in high school, appellant got on a "religious kick" and went "around preaching" and would sit for long periods in a trance. One time he was found in his room holding a gun and she had to call the police to disarm him. She also testified that once, on a hunting trip, appellant had jumped in front of a friend's gun.

Three months before the shooting she noticed his behavior changed again and he became more withdrawn, and drank more heavily. Then he started attending church again and quit drinking and using drugs "cold turkey." This testimony matched that of appellant's roommate. His mother said appellant had never married and she was unaware that he had any children, except that about a month before the incident he began talking about his son in Oklahoma. He had a former girlfriend who lived in Oklahoma, but the girlfriend denied having a child by appellant. Appellant's mother testified appellant's preoccupation with having a son "just came out of the blue." Several witnesses testified that Lonnie, the deceased, had become a new father shortly before the shooting.

Dr. Gilbert Maldonado was the psychiatrist who treated appellant at the hospital. Dr. Maldonado saw appellant when he was admitted on June 6, 1985, saw him regularly during his three week hospital stay and frequently since his discharge from the hospital. Appellant was discharged on June 24, 1985, and at that point Dr. Maldonado's diagnosis was: marijuana abuse; alcohol abuse; and "schizophrenia, paranoid type, chronic with acute exacerbation."

Dr. Maldonado also examined appellant on July 30, 1985, pursuant to a court order, and diagnosed: mixed drug abuse in remission, alcohol dependency in remission, and "schizophrenia, paranoid type, chronic in partial remission, tobacco dependence, schizoid personality disorder, premorbid." He testified that appellant was still hearing voices at this time, but was not following their commands. He felt appellant was in remission because of medication and the protective environment of the jail. Dr. Maldonado stated that, "My opinion was that at the time of the crime he was what is called in legal terms insane. That means he was psychotic. He had no touch with reality. He didn't know whether his conduct was right or wrong."

On cross-examination, Dr. Maldonado stated that he based his diagnosis on his own observations of appellant, appellant's history, and psychological testing. The diagnosis was based on the Diagnostic and Statistical Manual of Mental Disorders III by the American Psychiatric Association. He admitted that mental diseases classified in the manual can and have been removed or modified based on the opinions of the psychiatric community. He admitted that psychiatry is not an exact science. He had no way of objectively knowing whether a person was hearing voices, or otherwise hallucinating, other than his own observations of the person.

When asked whether another psychiatrist could examine appellant and diagnose him differently, the doctor replied that in this case, "everybody will agree that he has a problem." He did not feel appellant's symptoms could be faked. He also did not think that the traumatic incident of killing his brother could have caused the schizophrenic symptoms because he believed appellant already had the disorder at the time of the shooting, based upon his observations of appellant shortly after the incident.

However, Dr. Maldonado later answered affirmatively when asked if appellant's psychotic episode could have been completely independent from his mental state at the time the crime was committed. He also answered affirmatively when asked if

he would classify appellant's disorder as mild, as opposed to severe.

Dr. Joel Kutnick was the other psychiatrist who examined appellant. He saw appellant once for one-and-a-half hours on February 21, 1986. Dr. Kutnick's impression was that appellant's inner thinking was defective. He had delusions that his brother was Satan and had beheaded appellant's son. Even though appellant had been under treatment at the time Dr. Kutnick examined him, the doctor still saw evidence of mental disease processes. He diagnosed appellant as having "schizophrenia, paranoid type in partial remission." As to appellant's legal sanity, Dr. Kutnick's opinion was that at the time of the shooting appellant "was mentally ill to the extent that he did not know his actions were wrong."

On cross-examination, Dr. Kutnick admitted that psychiatry involves a lot of speculation and conjecture, and that different psychiatrists can arrive at different opinions regarding the same set of symptoms. He also agreed that someone familiar with psychiatry could feign symptoms and be diagnosed as schizophrenic. Further, he stated that it was possible for a person to be normal at the time they commit a crime like this, and yet become psychotic afterwards.

Dr. Kutnick testified that in instances where a patient is facing criminal charges, he is often skeptical about what the patient tells him. However, in this case he felt appellant was genuine. He stated that he had conducted numerous examinations of people charged with crimes and had found the vast majority of them were not insane at the time of the offense. On further cross-examination, he admitted that psychiatry is still at a stage "where we can be fooled."

Tex.Penal Code Ann. § 8.01(a) (Vernon Supp.1987), provides: "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." The accused has the burden to prove the affirmative defense of insanity by a preponder-

ance of the evidence. *Waggoner v. State*, 649 S.W.2d 667, 670 (Tex.App.—Corpus Christi 1983, no pet.); Tex.Penal Code Ann. § 2.04(d) (Vernon 1974).

In determining whether there is sufficient evidence to support a jury's implicit rejection of an affirmative defense, an appellate court:

> must review the evidence of the affirmative defense by looking at the evidence in the light most favorable to the implicit finding of the jury with respect to such affirmative defense and then determine, by examining all the evidence concerning the affirmative defense, if any rational trier of fact could have found that the defendant failed to prove his defense by a preponderance of the evidence.

*Schuessler v. State*, 719 S.W.2d 320, 328 (Tex.Crim.App.—1986) (not yet reported) (original opinion withdrawn on State's motion for rehearing) (quoting *Van Guilder v. State*, 709 S.W.2d 178, 181 (Tex.Crim.App. 1985), *cert. denied,* — U.S. ——, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986)). Thus, we must decide here whether the evidence, viewed most favorably to the jury's verdict, is sufficient to support the jury's implicit rejection of appellant's affirmative defense. In other words, we are only to determine whether the jury finding was rational.

The issue of insanity at the time of the offense ultimately lies exclusively within the province of the jury. *Graham v. State*, 566 S.W.2d 941, 952 (Tex.Crim.App. 1978). The question of insanity is not strictly a medical one, and though expert medical testimony may aid the jury in its ultimate determination, such evidence is not conclusive on the issue.

If there is evidence on both sides of the issue of insanity, as is evident in this record, it is difficult to find that a jury has acted irrationally. In *Van Guilder*, 709 S.W.2d 178, the Court of Criminal Appeals noted that the prosecution's rebuttal evidence could be "by cross-examination of defendant's witnesses or by direct examination of their own witnesses." However, the Court continued, where the prosecution produced no rebutting direct examination in the face of strong, overwhelming evi-

dence of insanity, and even admitted its expert concurred with the five defense experts, a reviewing court can only conclude that the jury finding against insanity was irrational.

■ There is a distinction between medical insanity and legal insanity within the meaning of Section 8.01(a). The existence of a mental disease alone is not sufficient to establish legal insanity unless the accused was mentally ill to the point that he did not know his conduct was wrong.

■ In some instances, it is not necessary for the State to produce expert medical testimony that an accused was sane at the time of the offense in order to counter defense experts. *Schuessler, supra; Graham, supra; Hernandez v. State,* 157 Tex. Cr.R. 112, 247 S.W.2d 260, 261 (1952); *Wade v. State,* 630 S.W.2d 418, 419 (Tex. App.—Houston [14th Dist.] 1982, no pet.). The circumstances of the offense, the life experiences of the accused, and his actions before and after the crime are also relevant in determining sanity at the time of the offense. *Ross v. State,* 153 Tex.Cr.R. 312, 220 S.W.2d 137, 139 (1949).

Attempts to conceal incriminatory evidence and to elude officers have been held to indicate cognizance of wrongful conduct. Similarly, surrendering to the police and confessing a crime has also been considered to indicate a realization of wrongful conduct. *Ross, supra.*

■ Although in the instant case the State did not produce expert witness testimony that appellant was sane at the time of the offense, we do find that the State presented significant and ample rebuttal evidence. On cross-examination of defense experts, the State was able to impugn (to some degree) the reliability of psychiatric diagnoses in general. The State also presented the testimony of numerous sheriff's officers who had ample opportunity to observe appellant's behavior shortly after the crime was committed, and before any of the defense experts had the opportunity to observe him. Though appellant made some bizarre statements to the officers, he behaved calmly and rationally, and expressed an awareness that his statements were bizarre and that other people might find them incredible.

■ The record clearly shows that appellant's actions just after the shooting were methodical and calculating. He remembered to retrieve the spent shell from the scene of the crime. He cleaned the shotgun, got a ladder from the garage, climbed to the attic and placed it with some other guns, and then returned the ladder. After some reflection and urging from a co-worker, appellant had the presence of mind to call the police and confess to what he himself termed a murder. These actions also provided the jury with a "strong logical basis" for concluding that appellant was not insane at the time the offense was committed. The reason for a jury trial is to afford the men and women of the jury the opportunity to observe all of the witnesses and to determine, in their discretion, not only the credibility of the witnesses and the weight to be given their testimony, but also the limits of the defense itself. *Graham, supra.* Having reviewed the entire record we hold that there was sufficient evidence to support the jury's rejection of appellant's affirmative defense of insanity. The judgment of the trial court is AFFIRMED.