COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

TERRY DANIEL MCDONALD, §

        Appellant, §

v. §

THE STATE OF TEXAS, §

        Appellee. §

§

No. 08-08-00103-CR

Appeal from the

409th District Court

of El Paso County, Texas

(TC# 20050D05962)

## **O P I N I O N**

Appellant, Terry McDonald, was convicted of murder and sentenced to life imprisonment. In three issues on appeal, Appellant complains of ineffective assistance of counsel, improper jury argument, and a violation of the attorney-client privilege. We affirm.

## **BACKGROUND**

For the past fifteen years, Darryl Glidewell rented a bedroom in Felipe Andrade's duplex. Glidewell and Andrade maintained a father-son type of relationship, and would watch television, travel, and frequent bars together. Although Glidewell noted that Andrade would occasionally "party hard" when he consumed alcohol, Glidewell never knew Andrade to be a crazy or angry drunk, nor would he become angry if someone rejected his sexual advances.

In November 2004, Andrade, at age 61, allowed Appellant to move into the other spare bedroom in his duplex rent free in exchange for performing work around the house. The following month, Glidewell noticed that the television and computer monitor were broken, and learned that Andrade and Appellant had fought. However, sometime later, Appellant moved into Andrade's room and began sharing his bed. Glidewell never heard any complaints that Appellant refused to

engage in sexual relations with Andrade.

In late May 2005, Andrade disappeared. Specifically, Glidewell recalled last seeing Andrade on May 22, 2005, Glidewell's birthday. In June, Glidewell questioned Appellant about Andrade's disappearance, and Appellant responded that Andrade took a trip to Washington but was keeping in contact through email and instant messaging. Also at that time, Appellant threw out a dresser, assumed full control over the house, and locked himself in Andrade's room.

Andrade's sister, Rachel Morales, grew concerned when she stopped hearing from Andrade. As Andrade did not respond to letters from family members, Rachel sent her eldest brother to check on him. But no one answered the door. After another visit proved unsuccessful, Rachel went to Andrade's duplex in late August 2005. But she too received no answer when she knocked on the door. On August 30, 2005, Rachel returned to Andrade's duplex with her brother and husband, and after receiving no response at the door, they removed the back door from its hinges and entered the house.

Inside, Rachel confronted Appellant, who just exited Andrade's bedroom and appeared upset and confused by their presence in the house. Appellant told Rachel that Andrade was upset and left, and was never returning. He further relayed that Andrade left him in charge of the house and finances. Rachel found Appellant's explanation implausible as Andrade would not have left without telling her first. And she grew suspicious upon seeing Andrade's bank statements, reflecting transactions taking place in El Paso, and certain necessities in the trash, including his eyeglasses, checkbook, and passport, and his medical supplies for his diabetes. Rachel told Appellant that if she did not hear from Andrade by the following day, she was going to the police.

The next day, Rachel returned to Andrade's duplex with the police. Appellant, however, had already left, taking his personal belongings and the hard drive from the computer. On September

22, 2005, Glidewell and Rachel found Andrade's decomposed corpse buried under a truck camper shell in the front yard of the duplex. The autopsy revealed that the degree of decomposition was consistent with being buried in the ground for almost four months. Further, the autopsy established that the cause of death was asphyxiation due to compression of the neck, and that Andrade also suffered a skull fracture that may have contributed to his death.

On October 4, 2005, Appellant was arrested for murder in Bayside, Wisconsin. After Appellant was transported to the station, an officer cleaned the squad car. In so doing, he found a credit-card sleeve tucked into a seam in the backseat floorboard. Inside the sleeve was Andrade's ATM card, check card, and Lone Star card. Andrade's bank records showed ATM withdrawals and online purchases made from June through October of 2005.

Appellant's defensive theory at trial was that he killed Andrade in self-defense. Appellant relayed that at first, he had no problems with Andrade. They would watch television together, converse over common interests, and frequent bars together. Claiming Andrade had an avid interest in internet pornography, Appellant noted that he helped Andrade obtain internet service at some point in December or January, so that Andrade would be able to search for such sites on the world wide web.[1] Also during this time, Appellant began taking over Andrade's finances "to bring those funds back into context," as Andrade "was always spending and borrowing." In addition, Appellant moved into Andrade's room and began sharing his bed as Appellant did not have a bed and Glidewell's smoking made him dizzy.

However, in late December, after Christmas, Appellant testified that Andrade, "out of the blue," asked to perform oral fellatio on him. When Appellant refused, Andrade gave him a "weird

---

[1] Despite Appellant's allegation, records from Time Warner Cable established that internet service was not installed at Andrade's home until June 4, 2005.

look" and Appellant went to bed. According to Appellant, Andrade persisted in his request to perform oral sex over the next week. Appellant stated that Andrade grew more "excited" in his requests and tried to entice him with pornography. Appellant eventually acquiesced to Andrade's requests, claiming Andrade would "kick [him] the fuck out" if he refused.

Appellant also alleged that Andrade raped him on another occasion. After a night of drinking with Andrade at a bar, Appellant returned home and passed out. When he awoke, Appellant claimed that he was bleeding from the anus. Appellant testified that when he confronted Andrade about it, Andrade admitted to fondling him while he was unconscious.

According to Appellant, Andrade repeatedly demanded sexual favors from him. Appellant testified that Andrade would play pornographic videos, masturbate in front of him, ask him to join in, and plead for him to engage in anal intercourse. Appellant refused because he was not gay and he had been sexually molested as a child. Because of his repeated refusals, Appellant testified that Andrade would get mad and on one occasion, struck him in the face. Appellant relayed that on another occasion, Andrade got so mad that he broke the computer monitor and television with a hammer. Appellant also stated that Andrade called him a "bitch," "whore," and "prostitute," and told him that he was "fucking worthless" and was only there for his enjoyment.

Turning to the day of Andrade's death, Appellant related that Andrade was standing near the kitchen door, yelling that Appellant was going to"fuck him in the ass." Appellant then recalled Andrade throwing a book and bicycle pump at him. Appellant attempted to calm Andrade down, but Andrade, according to Appellant, turned toward the area where the shovel and hammer were kept. At that point, Appellant grabbed the hand Andrade was using to hold his coffee mug, and they became entangled in a fight, hitting each other. Appellant then felt a blow to his head, at which point he experienced "blurred vision, dizziness, and nausea," lost consciousness, and fell to the floor.

When he awoke, Appellant was on top of Andrade.  Appellant could not recall what happened but saw blood trickling down from Andrade's ear and mouth.  Appellant did not call for help, and when night fell, he buried Andrade in the front yard, covering his grave with a camper shell.

During the punishment phase of the trial, the State introduced evidence that Appellant previously murdered Mary Mount in Florida.  According to his confession, Appellant claimed that Mary enjoyed physically demanding sex, and that after having sex one night, he awoke to find Mary having trouble breathing and clutching her throat.  Appellant tried to help her by performing the Heimlich Maneuver, doing chest compressions, and massaging her throat, but his state of panic and anxiety caused him to black out.  When he regained consciousness, Appellant was lying halfway on top of Mary and discovered that she was not breathing.  Rather than calling for help, Appellant stuffed her body in a duffle bag, put it in the trunk of her car, drove to her mother's house, and stole Mary's computer and jewelry.  He then drove to Texas, using Mary's credit and debit cards along the way, and ultimately buried her body in Hudspeth County.

## DISCUSSION

Appellant raises three issues for our review.  The first contends that counsel was ineffective, the second alleges an improper closing argument, and the third asserts a violation of the attorney-client privilege.  For the reasons discussed below, we find no merit in any of the issues raised.

### Ineffective Assistance of Counsel

In his first issue, Appellant complains of trial counsel's effectiveness in two respects.  First, he contends that counsel failed to timely raise an insanity defense despite evidence showing he was mentally ill.  Second, Appellant faults counsel for not requesting an instruction on sudden passion when the evidence raised the defense.  We do not believe counsel rendered ineffective assistance in either regard.

*Standard of Review*

The federal and state constitutions guarantee a defendant the right to reasonably effective assistance of counsel. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. However, that right does not exclude errorless counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). Thus, to prevail on a claim of ineffective assistance of counsel, the defendant must show (1) his counsel's performance was deficient and (2) a reasonable probability exists that the result of the proceeding would have been different but for counsel's actions. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Under the first prong, the defendant must show that counsel's performance fell below an objective standard of reasonableness. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). In other words, the defendant must prove objectively, by a preponderance of the evidence, that counsel's representation fell below professional standards. *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002). The second prong requires the defendant to show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694; *Thompson*, 9 S.W.3d at 812. "Reasonable probability" means a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Failure to make a showing under either prong defeats a claim for ineffective assistance of counsel. *Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003).

In analyzing counsel's effectiveness, we consider the adequacy of counsel's assistance as viewed at the time of trial, not through hindsight. *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App. – Houston [1st Dist.] 1996, no pet.). Thus, the defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances. *Strickland*, 466 U.S. at 689; *Gamble*, 916 S.W.2d at 93. Moreover, "any allegation of ineffectiveness must be firmly

founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness."

*Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001) (quoting *Thompson*, 9 S.W.3d at 814).

A silent record that provides no explanation for counsel's actions will not overcome the strong

presumption of reasonable assistance. *Rylander*, 101 S.W.3d at 110-11. Although we will not

speculate to find an attorney ineffective, "we commonly assume a strategic motive if any can be

imagined and find counsel's performance deficient only if the conduct was so outrageous that no

competent attorney would have engaged in it." *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim.

App. 2005); *see also Gamble*, 916 S.W.2d at 93.

### *Insanity Defense*

The record reflects that trial counsel filed a motion for a competency examination on

February 24, 2006, noting that Appellant attempted suicide by ingesting 153 pills of Selexia and 24

pills of Colopan. Counsel also contended that Appellant's communications with him were

"increasingly erratic," that he was not taking his medications, and that he was "in acute need of

psychiatric intervention." On May 1, 2006, the trial court granted the motion and ordered Appellant

to be examined by Dr. Cynthia Rivera. Dr. Rivera found Appellant competent to stand trial.

On August 1, 2007, sixteen days before the set trial date, counsel, at Appellant's request, filed

notice of intent to raise an insanity defense, and moved for another psychiatric examination of

Appellant to determine whether he was insane at the time of the murder.[2] According to counsel,

---

[2] Article 46C.051(b) of the Code of Criminal Procedure requires notice of an insanity defense to be filed at least twenty days before the date the case is set for trial. TEX. CODE CRIM. PROC. ANN. art. 46C.051(b) (Vernon 2006). However, that provision did not go into effect until September 1, 2005. *Id*. Thus, counsel filed the motion under the prior statute, which only required ten days notice. *See former* TEX. CODE CRIM. PROC. ANN. art. 46.03 § 2(a) (repealed by Acts 2005, 79th Leg., ch. 831, § 1). Nevertheless, Appellant refers us to article 46C.051 on appeal, and given his argument that counsel untimely filed his notice to pursue an insanity defense, we assume Appellant is requesting our evaluation of counsel's effectiveness to commence under article 46C.051. Regardless of whether the current or former statute applies, our discussion below demonstrates that there was no evidence of insanity such that counsel could be rendered ineffective for failing to allege the defense sooner than he did.

Appellant's sanity was questionable given: (1) his attempted suicide in March 2006; (2) his confession, which suggested he suffered from blackouts; (3) his *pro se* pleadings for mandatory withdrawal and to recuse the judge, which seemingly indicated a "psychiatric imbalance;" and (4) the fact that he "lost it" on another day while in jail and destroyed an entire file by flushing it down the toilet. The prosecutor, believing the insanity defense was a stalling tactic, responded that there was no evidence proving Appellant's alleged actions while in jail, argued that Appellant's *pro se* pleadings and testimony at prior hearings demonstrated sanity, and noted that counsel had not once raised insanity in the two years he had to prepare for trial, even when he moved for the competency examination in February 2006. Counsel retorted that the insanity issue was not raised sooner for two reasons: (1) Appellant was insisting on raising insanity although counsel "didn't see the basis for it;" and (2) because the trial court denied his motion to suppress Appellant's confession the month before, the defense's strategy was changed to focus on the blackout alleged therein.[3]

The trial court found counsel's notice of the defense untimely, noting former article 46.03, § 2(a)(2) required counsel to give notice of insanity at the time the article 28.01 pretrial hearing, which was held on December 15, 2006. *See* TEX. CODE CRIM. PROC. ANN. art. 46.03, § 2(a)(2) (stating that a defendant must file notice of insanity at the pretrial hearing set by the court). Because he did not, the notice was untimely, and the court ruled that any evidence of insanity would not be admissible. Nevertheless, the trial court, on October 5, 2007, ordered Appellant to submit to an examination by Dr. Arthur Ramirez. Those results are not found in the record.

On appeal, the State notes that following the trial, Appellant filed a motion for new trial but did not allege ineffective assistance of counsel, that no hearing was held on the motion, and that the

---

[3] Appellant alleged in his confession that after they fell to the ground, he must have blacked out because he could not recall what happened.

motion was overruled by operation of law, thus presenting a silent record from which we cannot determine why counsel did not raise the insanity defense sooner than he did. As we noted before, a silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Rylander*, 101 S.W.3d at 110-11. However, at the hearing on counsel's notice of intent to raise the insanity defense, he explained why he did not raise the defense sooner. Thus, we are not faced with a completely silent record here.

Nevertheless, we do not find any merit in Appellant's allegation of ineffective assistance of counsel. The decision not to pursue an insanity defense is a matter of trial strategy, *see Gottson v. State*, 940 S.W.2d 181, 185 (Tex. App. – San Antonio 1996, pet. ref'd), and we cannot conclude that counsel's failure to seek an insanity defense sooner than he did so in this case lacked a plausible basis. *See Gamble*, 916 S.W.2d at 93 (we consider counsel's actions at the time they occurred, not through hindsight).

The record shows that Appellant was examined by two doctors. The first doctor concluded that Appellant was competent, and although the second doctor's conclusion does not appear in the record, we presume he found Appellant competent as well, as Appellant later stood trial and the insanity defense was not asserted again. Although Appellant alleges that his *pro se* pleadings demonstrated a psychiatric imbalance, we, having reviewed the pleadings and his testimony at the pretrial hearings and trial, note that he was able to communicate his position clearly and competently, that he demonstrated an understanding of the legal proceedings in the case, and that his testimony was lucid and clear. Even counsel acknowledged to the court that he "didn't see the basis for" the defense, acknowledging that he was pursuing the defense at Appellant's insistence. It was not until after the trial court denied the motion to suppress Appellant's confession that the defense decided

to change strategies to focus on the blackout alleged in the confession and pursue insanity.[4]  Such were plausible bases for counsel not to pursue the defense of insanity earlier than he did, and we do not find counsel's performance deficient in this regard.  *See Gottson*, 940 S.W.2d at 185 (finding counsel's decision not to pursue insanity was sound strategy when counsel listened to appellant, reviewed medical records, and decided that the defense would not be in appellant's best interest); *Donnell v. State*, 148 S.W.3d 674, 676 (Tex. App. – Beaumont 2004, no pet.) (finding counsel not ineffective for failing to pursue insanity when appellant's testimony reflected that he was able to communicate clearly about his behavior and rationalizations for that behavior).

Even if we were to conclude that counsel's performance was deficient, we do not find a reasonable probability that the trial would have produced a different result.  When insanity is alleged, the focus is on the mental state of the defendant at the time the crime is committed.  *See* TEX. PENAL CODE ANN. § 8.01(a) (Vernon 2003); *Nelson v. State*, 149 S.W.3d 206, 211-12 (Tex. App. – Fort Worth 2004, no pet.).  Mere evidence of a mental disease alone is not sufficient to establish legal insanity unless the defendant was mentally ill to the point that he did not know his conduct was wrong.  *Plough v. State*, 725 S.W.2d 494, 500 (Tex. App. – Corpus Christi 1987, no pet.).  Here, Appellant has pointed to nothing in the record that establishes insanity at the time of the offense, that is, that he did not know his conduct was wrong when he killed the victim.  Rather, he simply points to his prior suicide attempt, the destructive incident in jail, his alleged irrational and illogical pleadings, and his blackout as alleged in the confession.  However, his actions while in jail and his alleged illogical pleadings, at most, demonstrate Appellant's mental problems in general; they do not establish his mental state at the time of the killing.  Similarly, his blackout during the fight does

---

[4]  Although the trial court denied Appellant's motion to suppress the written statement, the statement was not admitted at trial.

not establish insanity, and nothing in the record suggests that he did not know, at the time he began hitting Andrade, that his conduct was wrong. *See Nutter v. State*, 93 S.W.3d 130, 132 (Tex. App. – Houston [14th Dist.] 2001, no pet.) (finding that although appellant had a history of extensive psychological problems, that evidence alone was insufficient to establish legal insanity at the time of the offense). Finding no evidence that Appellant was insane at the time of the offense, counsel's failure to pursue such a defense at an earlier time did not prejudice the defense. *See Brown v. State*, 129 S.W.3d 762, 767 (Tex. App. – Houston [1st Dist.] 2004, no pet.); *Conrad v. State*, 77 S.W.3d 424, 426-27 (Tex. App. – Fort Worth 2002, pet. ref'd) (cases holding counsel's failure to pursue an insanity defense did not prejudice the defense when despite history of mental illness, there was no evidence showing appellant's insanity at the time of the offense). Accordingly, we reject Appellant's claim of ineffective assistance of counsel in this regard.

*Sudden-Passion Instruction*

Appellant also faults counsel for failing to request a sudden-passion instruction. At trial, counsel focused on self-defense and such an instruction was included in the court's charge. That same evidence, according to Appellant, also raised sudden passion. However, at punishment, counsel did not request an instruction on sudden passion.

Assuming *arguendo* that the trial evidence arguably raised the issue of sudden passion, we note that the record is silent as to counsel's reasons for not requesting a sudden-passion charge. Unlike Appellant's first allegation where counsel explained his reasons for not filing a notice of intent to seek insanity sooner, here, counsel has simply not been provided an opportunity to explain his actions. Although Appellant filed a motion for new trial, he did not allege ineffective assistance of counsel, and no hearing was had on the motion. To conclude that the representation by counsel was deficient without a proper record exploring his trial strategy and rationale why he did not request

the instruction would require us to speculate as to counsel's motivation and reasoning, which we may not do.[5]  Therefore, without evidence in the record to establish both deficiency and rebut the presumption of reasonable assistance, Appellant is unable to satisfy the first prong of *Strickland* in this regard.  *See Rios v. State*, 990 S.W.2d 382, 386 (Tex. App. – Amarillo 1999, no pet.) ("In light of the absence of proof as to trial counsels [sic] reasons for or strategy in not requesting the sudden passion mitigating instruction, we will not speculate on trial counsels [sic] strategy, mental processes, or reasons for not requesting the [sudden-passion] instruction."); *Ramirez v. State*, No. 04-03-00733-CR, 2004 WL 2997747, at *2 (Tex. App. – San Antonio Dec. 29, 2004, pet. ref'd) (mem. op., not designated for publication) (because record was silent as to counsel's reasons for not requesting an instruction on sudden passion, appellant failed to show ineffective assistance of counsel in this regard).  Therefore, in light of the silent record, we decline to find counsel was ineffective for failing to request a sudden-passion instruction.

Having concluded that Appellant has not shown ineffective assistance of counsel on the bases alleged, we overrule his first issue.

## Prosecutor's Argument

Appellant's second issue contends that the prosecutor engaged in improper jury argument by stating, "I have zero respect for this Defense.  I find it slimy, offensive and tricky."  According to Appellant, the comment struck at him over the shoulders of counsel.  The State responds that Appellant's complaint is not preserved for our review.

---

[5]  We agree with the State's speculation that counsel may have reasonably believed that if the jury rejected Appellant's claim of self-defense, they would also reject any claim of sudden passion, which was based on the same facts, and therefore, counsel's decision not to request a sudden-passion instruction had a plausible basis.  *See Chavez v. State*, 6 S.W.3d 56, 65 (Tex. App. – San Antonio 1999, pet. ref'd); *Ervin v. State*, No. 01-08-00207-CR, 2008 WL 5263635, at *7 (Tex. App. – Houston [1st Dist.] Dec. 18, 2008, pet. ref'd) (mem. op., not designated for publication) (cases finding counsel's decision not to request a sudden-passion instruction did not fall below an objective standard of reasonableness where counsel may have believed that if the jury rejected appellant's claim of self-defense, they would also reject any claim of sudden passion based on the same facts).

*Applicable Facts*

The record reflects that when the prosecutor made the complained-of comment, Appellant raised the following objection: "Your Honor, I'm going to object to those sidebar comments. And, frankly, it's inappropriate on the part of counsel." The trial court sustained the objection. Appellant then asked for a limiting instruction and an admonishment to the prosecutor "that she knows she's out of line." The trial court instructed the jury to disregard the prosecutor's comment. Appellant did not then move for a mistrial. However, the following day, after the jury found Appellant guilty and the State's first punishment witness finished testifying, Appellant moved for a mistrial on grounds that the prosecutor's closing argument during guilt-innocence was "so highly prejudicial that we don't believe we can get a fair trial." The trial court believed the mistrial motion was untimely but ruled anyway, denying the motion.

*Preservation of Error*

To preserve error regarding improper jury argument, a defendant ordinarily should (1) contemporaneously object to the statement; (2) request an instruction that the jury disregard the statement if the objection is sustained; and (3) move for a mistrial if the instruction is granted. *Cooks v. State*, 844 S.W.2d 697, 727-28 (Tex. Crim. App. 1992). However, this sequence is not essential to preserve complaints for appellate review; rather, the essential requirement is a timely, specific request that the trial court refuses. *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). When the trial court sustains an objection, instructs the jury to disregard, and denies the mistrial, the issue on appeal is whether the trial court abused its discretion by denying the motion for mistrial. *Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004). Moreover, the appellate complaint challenging the motion for mistrial must comport with the motion made at trial. *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995); *Rivera v. State*, No. 08-05-00339-

CR, 2007 WL 766129, at *2 (Tex. App. – El Paso Mar. 15, 2007, no pet.) (op., not designated for publication). And the mistrial motion must be timely, that is, it must be made as soon as the grounds for the mistrial becomes apparent. *Griggs v. State*, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007).

Here, the trial court sustained Appellant's objection to the prosecutor's closing argument. Therefore, the only adverse ruling from which Appellant can appeal is the denial of his motion for mistrial. *Hawkins*, 135 S.W.3d at 76-77. Appellant moved for a mistrial on grounds that the prosecutor's closing argument was "so highly prejudicial that we don't believe we can get a fair trial." The State asserts that such an objection is too general and does not comport with Appellant's specific complaint on appeal. However, a general objection can be sufficient to preserve error when the record shows the trial court understood the nature of the objection. *See, e.g., Everett v. State*, 707 S.W.2d 638, 641 (Tex. Crim. App. 1986) (holding objection on grounds that an argument was "improper" sufficiently preserved error based on prosecutor's argument, coupled with defense counsel's objection, which informed the court of the type of error, and trial court admonished prosecutor after overruling defense counsel's objection); *Davila v. State*, 952 S.W.2d 872, 878 (Tex. App. – Corpus Christi 1997, pet. ref'd) (holding "improper argument" objection was general, but error preserved because court admonished prosecutor before denying mistrial); *Martinez v. State*, 833 S.W.2d 188, 192 (Tex. App. – Dallas 1992, pet. ref'd) (holding "improper" and "inflammatory" objection to jury argument was general but sufficient to preserve error under circumstances because trial judge and prosecutor were aware of substance of objection as court instructed jury to remember testimony as they heard it). Here, Appellant's "sidebar" objection, coupled with his request that the prosecutor be admonished and motion for mistrial, pointing out the inappropriate comment and alleging it was highly prejudicial, was sufficient to put the trial court on notice that Appellant was asserting that the prosecutor struck at him over the shoulders of counsel. Therefore, we believe that

Appellant's objection at trial comports with his complaint on appeal.

Nevertheless, we note that Appellant did not move for a mistrial until after the State's first punishment witness testified. It was clear that the grounds for a mistrial was apparent when Appellant first made his objection and moved for an instruction to disregard. Waiting until after the State's first punishment witness testified is simply too late to move for a mistrial concerning an improper closing argument at guilt-innocence. Therefore, we find that the motion for mistrial was untimely and nothing is preserved for our review. *See Griggs*, 213 S.W.3d at 927 (mistrial stemming from witness's testimony was untimely made when appellant did not move for mistrial until after witness concluded his testimony and another witnesses testified); *Fenoglio v. State*, 252 S.W.3d 468, 476 (Tex. App. – Fort Worth 2008, pet. ref'd) (mistrial stemming from seating an unqualified juror not timely when made two months later).

Appellant, citing *Romo v. State*, 631 S.W.2d 504, 505 (Tex. Crim. App. 1982), seems to assert that the argument was so prejudicial that an objection or timely motion for mistrial was not necessary. However, the Court of Criminal Appeals expressly overruled *Romo* and its progeny fourteen years ago in *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1173, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997). There the Court stated that "[b]efore a defendant will be permitted to complain on appeal about an erroneous jury argument or that an instruction to disregard could not have cured an erroneous jury argument, he will have to show he objected and pursued his objection to an adverse ruling." *Cockrell*, 933 S.W.2d at 89. Therefore, Appellant was required to timely raise his appellate complaint to the trial court before we may address it. Because he did not, any error is not preserved. *See Griggs*, 213 S.W.3d at 927. Accordingly, Appellant's second issue is overruled.

**Attorney-Client Privilege**

Appellant's third issue contends that the trial court violated the attorney-client privilege by admitting a phone call recording between Appellant and his stepmother, Judy McDonald, which contained an "allegation that defense counsel stated that the decedent deserved killing." According to Appellant, because he appointed Judy, a non-licensed attorney, to act on his behalf under a durable power of attorney, and because she was working on behalf of his trial counsel, any communications between them were privileged. We disagree.

*Rule 503*

Rule 503 provides that a "client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client: (A) between the client or a representative of the client and the client's lawyer or a representative of the lawyer; (B) between the lawyer and the lawyer's representative; (C) by the client or a representative of the client, or the client's lawyer or a representative of the lawyer, to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein; (D) between representatives of the client or between the client and a representative of the client; or (E) among lawyers and their representatives representing the same client." TEX. R. EVID. 503(b)(1). In criminal cases, the privilege prevents the lawyer or the lawyer's representative from disclosing any facts that come to light from the lawyer or the lawyer's representative by reasons of the attorney-client relationship. *Id*. at 503(b)(2). A "lawyer" is a person authorized, or reasonably believed by the client to be authorized, to engage in the practice of law in any state or nation, whereas a "representative of the lawyer" is either one employed by the lawyer to assist the lawyer in the rendition of professional legal services or an accountant who is reasonably necessary for the lawyer's rendition of professional legal services. *Id*. at 503(a)(3), (4).

*Application*

We first address Appellant's assertion that Judy, being appointed by durable power of attorney, was acting on his behalf, that is, as his attorney, in his criminal prosecution. A durable power of attorney simply designates another as the principal's "attorney in fact," meaning one designated to transact business for another. *See Black's Law Dictionary* 124 (7th ed., West 1999). A power of attorney does not authorize one to act as a licensed attorney at law, representing individuals in proceedings in court. *Harkins v. Murphy & Bolanz*, 51 Tex. Civ. App. 568, 112 S.W. 136, 138 (Dallas 1908, writ dism'd). Nor does it confer authority on individuals to act as counsel in a criminal prosecution. *See Elwell v. Mayfield*, No. 10-04-00322-CV, 2005 WL 1907126, at *3 (Tex. App. – Waco Aug. 10, 2005, pet. denied) (mem. op., not designated for publication).

Here, the durable power of attorney executed by Appellant only appointed Judy to act as Appellant's agent in civil matters, limited to transactions involving real estate, tangible personal property, stocks and bonds, commodities and options, banking, business operations, insurance and annuities, estate, trust, and other beneficiary transactions, claims and litigations, personal and family maintenance, benefits from social security, Medicare, Medicaid, or other civil or military service government programs, retirement plans, and tax matters. Nothing in the executed document provided that Judy was to act as Appellant's attorney on his behalf in criminal cases. This comports with the proposition that the constitutional and statutory right to counsel in criminal prosecutions is limited to licensed counsel. *See Coyle v. State*, 775 S.W.2d 843, 846 (Tex. App. – Dallas 1989, no pet.) (citing *Harkins*, 112 S.W. at 138). Thus, we cannot conclude that Appellant's appointment of Judy to act on his behalf with power of attorney extended to his criminal prosecution. *See Elwell*, 2005 WL 1907126, at *3 (holding that granting an individual power of attorney under the Durable Power of Attorney Act did not confer authority on individual to act as counsel in a criminal

prosecution). Because Judy was not a licensed attorney and could not act on Appellant's behalf in his criminal prosecution simply because she was appointed to act as his agent under a durable power of attorney, Appellant may not invoke the attorney-client privilege to exclude the phone-call recording. *See Strong v. State*, 773 S.W.2d 543, 549 (Tex. Crim. App. 1989) (to invoke the attorney-client privilege under Rule 503(a)(3)'s definition of "lawyer," appellant must have consulted with a licensed attorney).

Appellant also contends that Judy was acting on behalf of his counsel. As previously noted, the attorney-client privilege can be invoked to prevent the lawyer's representative from disclosing facts that come to light by means of the attorney-client relationship. TEX. R. EVID. 503(b)(2). As applicable in this case, a "representative of the lawyer" means one employed by the lawyer to assist the lawyer in the rendition of professional legal services. *Id*. at 503(a)(4). However, nothing in the record establishes that Appellant's counsel employed Judy to assist him in the rendition of any legal services related to the criminal prosecution. In fact, Appellant's counsel expressly represented to the trial court that Judy was working against his attorneys. Accordingly, Judy was not a representative of Appellant's counsel, and therefore, the attorney-client privilege did not extend to her telephone conversations with Appellant. *See* TEX. R. EVID. 503(a)(4), (b)(2); *cf. Burnett v. State*, 642 S.W.2d 765, 769 (Tex. Crim. App. 1983) (attorney-client privilege extended to hypnotist hired by defendant's attorneys).

Having concluded that the attorney-client privilege was inapplicable to the telephone conversation, the trial court did not abuse its discretion by admitting the recording. As such, Appellant's third issue is overruled.

## CONCLUSION

Having overruled Appellant's issues, we affirm the trial court's judgment.

_____
                                                    GUADALUPE RIVERA, Justice

September 30, 2010

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)