

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00020-CR

BRENT TROY BARTEL                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

### FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 1434748R

----------

## MEMORANDUM OPINION[1]

----------

Appellant Brent Troy Bartel appeals from his conviction for aggravated assault on a family member with a deadly weapon and eleven-year sentence and his conviction for injury to a child causing bodily injury and concurrent ten-year sentence. Bartel argues that the evidence did not support the jury's implicit

---

[1]*See* Tex. R. App. P. 47.4.

rejection of his insanity defense. Because we disagree, we affirm the trial court's judgments.

## I. LEGAL PRINCIPLES

### A. AFFIRMATIVE DEFENSE

Texas presumes that a defendant is sane and that he intends the natural consequences of his actions. *Ruffin v. State*, 270 S.W.3d 586, 591 (Tex. Crim. App. 2008). Insanity is an affirmative defense that the defendant has the burden to prove by a preponderance of the evidence. *See* Tex. Penal Code Ann. §§ 2.04(d), 8.01(a) (West 2011); Tex. Code Crim. Proc. Ann. art. 46C.153(a)(2) (West 2006). Insanity excuses a person from criminal responsibility even though the State proves all elements of the offense, including mens rea, beyond a reasonable doubt. Tex. Code Crim. Proc. Ann. art. 46C.153(a).

Insanity under the law is defined as a severe mental disease or defect that resulted in the actor not knowing that his conduct was wrong—illegal—at the time of the conduct charged. *See* Tex. Penal Code Ann. § 8.01(a); *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994), *cert. denied*, 515 U.S. 1162 (1995). In other words, a defendant's belief that his actions were morally justified does not equate to insanity under the law. *See Ruffin*, 270 S.W.3d at 592. As such, the affirmative defense of insanity is a legal issue, not a medical one. *See Plough v. State*, 725 S.W.2d 494, 500 (Tex. App.—Corpus Christi 1987, no pet.). The fact-finder's question then is whether "the defendant factually know[s] that society considers this conduct against the law, even though [he], due to his

2

mental disease or defect, may think that the conduct is morally justified." *Ruffin*, 270 S.W.2d at 592.

## B. STANDARDS AND SCOPES OF REVIEW

In four issues, Bartel argues that the evidence was legally and factually insufficient to support the jury's determination that he was guilty of aggravated assault and injury to a child in light of the admitted evidence establishing he was insane at the time of the offenses. Unlike challenges to the sufficiency of the evidence to support the elements of an offense that the State must prove beyond a reasonable doubt, challenges regarding an affirmative defense, which must be proved by a preponderance of the evidence, are amenable to legal- and factual-sufficiency review under the civil standards of review. *See Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013).

In a legal challenge to the sufficiency of the evidence to support an adverse finding on an affirmative defense, we look for more than a scintilla of evidence that supports the implied rejection of the affirmative defense and disregard all evidence supporting the affirmative defense unless a reasonable fact-finder could not disregard that evidence. *Id.* at 669. If the evidence supporting the affirmative defense is subject to a credibility assessment, allowing the fact-finder to disbelieve that evidence, we will not consider that evidence in our legal-sufficiency review. *Id.* at 670. "Only if the appealing party establishes that the evidence conclusively proves his affirmative defense and 'that no reasonable jury was free to think otherwise,' may the reviewing court conclude

3

that the evidence is legally insufficient to support the jury's rejection of the defendant's affirmative defense." *Id.* (quoting *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009)).

By challenging the factual sufficiency of the evidence to support the adverse finding, Bartel is asserting that the adverse finding on his affirmative defense was so against the great weight and preponderance of the entire body of admitted evidence as to be manifestly unjust. *See id.* at 670 n.29, 671. In this review, we look at all of the evidence in a neutral light while preserving the fact-finder's weight and credibility determinations. *Id.* at 671. We may find the evidence factually insufficient to support the rejection of an affirmative defense only "if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, [we] clearly state[] why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.* at 671. If we so conclude, the remedy is a new trial, not acquittal. *See id.* at 672.

## II. SUFFICIENCY OF THE EVIDENCE TO SUPPORT JURY'S SANITY FINDING

### A. ADMITTED EVIDENCE REGARDING BARTEL'S MENTAL STATE

Bartel does not dispute that at midnight on December 12, 2012, he carved a large pentagram into his six-year-old son's back with a box cutter. It is also undisputed that Bartel suffers from schizophrenia and that he believed he was

4

morally justified in carving the symbol into his son's back.[2]  Bartel, however, relies on the testimony of forensic psychologist Dr. Antoinette McGarrahan, his history of mental illness, and his "bizarre" behavior both before and after the offense to argue that the evidence, showing that he "believed he did the right thing," was legally and factually insufficient to find him guilty of the offenses based on his affirmative defense of insanity.

Bartel was a long-haul truck driver and was gone from the home he shared with his wife, Elaine, and young son, Peter,[3] for extended periods of time. Leading up to December 12, 2012, Bartel's behavior seemed "weird" to Elaine. He began to tell her that "something[]" would happen in 2012.  Once when Elaine caught Bartel staring at a sleeping Peter, Bartel said, "He looks so innocent."  He would frequently read the Bible, which he had not done before, and compulsively watched the movie "The Passion of the Christ" and the Daystar Television Network.[4]  On December 10, 2012, Bartel unexpectedly came home, stating that he was sick.  Bartel later stated that he had "headaches, and [his] stomach felt like a large snake was moving through [his] intestines" that day.

---

[2]Bartel, who was religious and credited numerology, believed that the end of the world would occur on December 12, 2012 at midnight.  To save his wife, who he believed had engaged in sinful behavior, his blood atonement from an innocent—his six-year-old son—was required.

[3]We use aliases to refer to Bartel's wife and son.  *See* Tex. R. App. P. 9.10; 2d Tex. App. (Fort Worth) Loc. R. 7.

[4]This was a "religious channel."

The next day, December 11, 2012, Bartel unexpectedly picked up Peter early from school and took him to his church,[5] where he had the reverend pray over Peter and bless him. When the reverend asked why Bartel was adamant that Peter be blessed that day, Bartel said, "Tomorrow is a special day." At midnight on December 12, 2012, Bartel took a box cutter and carved a large pentagram into Peter's back, permanently scarring him. When Elaine heard Peter screaming and ran to help him, Bartel told her that he did it because "the wom[e]n are sinful, so, therefore, the innocent children have to sacrifice their blood for forgiveness."[6] After Elaine was unable to get Peter away from Bartel, Elaine grabbed the box cutter and ran to their neighbor for help. Both Elaine and Bartel called 911.

When the police arrived, they spoke to Elaine at the neighbor's house. Elaine told the officers that Peter and Bartel were still at the house and showed them the box cutter. The officers then went to Bartel's house. Bartel calmly came out of the house and held his arms out from his side. The officers arrested Bartel and took him to the police station. In the patrol car, Bartel spontaneously told the officers he injured his son to save Elaine's soul:

---

[5]Elaine rarely attended church, but Bartel took Peter with him each Sunday that Bartel was in town.

[6]Apparently, Bartel believed Elaine had sinned based on Facebook photographs and videos he either had seen or had heard about in which she was "half naked."

I did what I had to do to save my wife's soul. I'm 38 years old, my son is 6 and the date is 12/12/12. It is all about the numbers. The numbers are the key. My wife is a sinner and she refuses to repent. So the only way to save her soul is to shed the blood of an innocent child.

The next day, Detective Tye Bell interviewed Bartel, who wrote a five-page, voluntary statement after waiving his rights. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 2 (West Supp. 2016). In it, Bartel wrote that in the days before December 12, 2012, he came to believe that "the only way to cleanse the wicked is through innocent blood cleansing," which is why he cut Peter's back—as "a rite of passage for [Elaine's] wicked sins." He also told Bell that he knew cutting Peter was against "man's law" but that he was "operating under God's law."

McGarrahan examined Bartel several times before his eventual trial[7] and had reviewed his past history of instability that began in his childhood, Bell's interview with Bartel, and his jail records. Because she could not follow Bartel's logic, she recorded each session, which is the first time she had done so in more than fifteen years. During one session she wrote that "he understands that . . . the act of cutting someone is wrong, but in the context in which he did it with his son, he felt that it was the right thing to do." McGarrahan equated this knowledge as similar to understanding that shooting a person is wrong. She testified that Bartel "absolutely believed what he was doing was right" in order to

---

[7]Bartel was found incompetent to stand trial three times before he was declared competent on September 24, 2015. *See* Tex. Code Crim. Proc. Ann. arts. 46B.053, 46B.054 (West 2006), art. 46B.084 (West Supp. 2016).

save Elaine. In fact, he "believed that God was controlling his behavior on the date of the offense and there was a spiritual or end-of-world experience, the coming of . . . the end of times." But she also agreed that he knew "cutting, using a knife and hurting another individual is wrong." During one interview, Bartel told her that he "knew [he] was going to get in trouble with the legal system." He told her that he called 911 not because he believed he had done something wrong but because Elaine convinced him that Peter's injuries would be a problem at school.

Ten other mental-health professionals also had evaluated Bartel and concluded that he suffers from "a severe mental illness," schizophrenia.[8] McGarrahan testified that people who suffer from schizophrenia are capable of discerning right from wrong. Dr. Randy Price testified that although Bartel was suffering from a severe mental illness at the time of the offense, he was not legally insane then because he knew his conduct was against the law. In making this determination, Price had met with Bartel and reviewed the offense reports, Bell's interview with Bartel, jail records, McGarrahan's report, the reports of the ten other mental-health professionals who had evaluated Bartel, Bartel's criminal history, and Bartel's childhood of neglect and abuse.

---

[8]Only two of these doctors opined as to Bartel's legal sanity on December 12, 2012: McGarrahan and Dr. Randy Price.

## B. LEGAL SUFFICIENCY

Bartel argues that the evidence of his insanity was "conclusive, and no reasonable jury could have disagreed." He relies on McGarrahan's testimony that Bartel suffers from schizophrenia, causing his reasoning to be "skewed and illogical," and on Price's concession that "but for [Bartel's] severe mental illness[,] the crime would never have occurred." First, this argument focuses on the fact that Bartel has a severe mental illness, which is undisputed. While tragic, Bartel's mental illness alone does not equate to his insanity under the law. *See Plough*, 725 S.W.2d at 500. Insanity as an affirmative defense to guilt requires that Bartel's mental illness caused him to not know that his conduct was proscribed by law on December 12, 2012. *See* Tex. Penal Code Ann. § 8.01(a); *Fisher v. State*, 397 S.W.3d 740, 744 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

Second, we disagree that Bartel conclusively proved his affirmative defense. Price testified that Bartel knew his conduct was against the law at the time of the offense. Further, Bartel told Bell that he knew his conduct was against "man's law," and he told McGarrahan that he knew his actions would result in legal trouble for him. This evidence is more than a scintilla supporting the jury's rejection of the affirmative defense. *See, e.g.*, *Pham v. State*, 463 S.W.3d 660, 672 (Tex. App.—Amarillo 2015, pet. ref'd); *Moranza v. State*, 913 S.W.2d 718, 724 (Tex. App.—Waco 1995, pet. ref'd). We overrule issues one and three.

9

## C. FACTUAL SUFFICIENCY

In arguing that the jury's rejection of his affirmative defense was against the great weight and preponderance of the evidence, Bartel points to McGarrahan's testimony that Bartel believed his actions were right and to the fact that McGarrahan spent "three time[s] more time with [Bartel] than Dr. Price [and, therefore,] she had greater opportunity to evaluate [Bartel's] reason for committing this offense." On this record, the jury was free to credit Price's testimony that Bartel knew his actions were illegal more heavily than McGarrahan's statement that Bartel believed his actions were "the right thing to do."[9] We will not second-guess these weight and credibility determinations. *See Matlock*, 392 S.W.3d at 671. The jury also heard that Bartel recognized that his conduct was against the law during Bell's interview and Price's evaluation. This evidence, even viewed in a neutral light, was factually sufficient to support the jury's rejection of Bartel's affirmative defense. *See, e.g.*, *Reyes v. State*, 480 S.W.3d 70, 74–76 (Tex. App.—Fort Worth 2016, pet. ref'd); *McAfee v. State*, 467 S.W.3d 622, 637–39 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *McCollom v. State*, No. 07-00-0282-CR, 2001 WL 121933, at *10 (Tex. App.—

---

[9]We do not necessarily agree with Bartel and the State that this testimony equated to evidence that Bartel did not know his conduct was illegal at the time he carved Peter's back. Indeed, Bartel's belief that his actions were morally right—not morally wrong—is not evidence that he did not know the law proscribed his conduct. *See Ruffin*, 270 S.W.3d at 592. Even McGarrahan recognized that Bartel knew cutting another person was "wrong." But because other evidence sufficiently supported the jury's finding on Bartel's affirmative defense, we need not quibble on this point.

Amarillo Feb. 13, 2001, no pet.) (not designated for publication). We overrule issues two and four.

## III. CONCLUSION

Although it was not disputed that Bartel suffered from a severe mental illness that caused him to believe his conduct on December 12, 2012 was morally right, the jury heard evidence that he knew his conduct was proscribed by law at the time of the offense, which was legally and factually sufficient to support its rejection of Bartel's affirmative defense of insanity. We overrule Bartel's issues and affirm the trial court's judgments. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 23, 2017